UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Citizens for a Clean Environment, LLC, <br><br> Plaintiff, <br> v. <br><br> Aitkin Agri-Peat, Inc., <br><br> Defendant, | Case No.: <br><br> **COMPLAINT** |

**PRELIMINARY STATEMENT AND FACTS**

1. This is an environmental citizen suit enforcement action brought to address Defendant's past and ongoing violations of the federal Clean Water Act, 33 U.S.C. § 1251 *et. seq.*, together with a cause of action sounding in negligence.

2. For years, Defendant has polluted Minnesota's Kettle River by repeatedly dumping acidic wastewater with unlawfully low pH levels into it in violation of the Clean Water Act.

3. According to the Environmental Protection Agency (EPA):

    ● "The term [pH] is used to indicate basicity or acidity of a solution on a scale of 0 to 14, with pH 7 being neutral."

    ● "pH affects most chemical and biological processes in water. It is one of the most important environmental factors limiting species distributions in aquatic habitats. Different species flourish within different ranges of pH, with the optima for most aquatic organisms falling between pH 6.5-8. U.S. EPA water quality criteria for pH in freshwater suggest a range of 6.5 to 9."

    ● "Fluctuating pH or sustained pH outside this range physiologically stresses many species and can result in decreased reproduction, decreased growth, disease or death. This can ultimately lead to reduced biological diversity in streams."

- "Even small changes in pH can shift community composition in streams. This is because pH alters the chemical state of many pollutants (e.g., copper, ammonia), changing their solubility, transport and bioavailability. This can increase exposure to and toxicity of metals and nutrients to aquatic plants and animals."

- "Low pH has both lethal and sublethal effects on organisms."

- Biological effects associated with low ph include, "Damage to gill epithelium, Mucus on gills, Decreased growth, Reproductive failure, Respiratory inhibition, Ionoregulatory impacts, Reduced number of species and individuals, Mortality, [and] Replacement of acid-sensitive species with acid-tolerant species."

- Low pH can cause "local extinction of fish populations due to low egg fertilization rates and failure of normal egg development …. In general, minnows (small members of the family Cyprinidae) are the first to disappear from acidifying streams."

- "Acid water also damages the skin and gills of fish, amphibians and invertebrates. Skin damage increases fish susceptibility to fungal infections, which may lead to diseases such as epizootic ulcerative syndrome. Gill and skin damage and associated mucus production reduce the ability of fish to take in oxygen or regulate salt and water intake."

- "Because pH is a logarithmic function, one unit change in pH (e.g., 7 to 6) indicates a 10x change in $H^+$ concentration in that solution."

4. According to the EPA, Defendant violated its Clean Water Act permit on (363) days between June 30, 2022, and February 29, 2024, by discharging wastewater with pH levels exceeding the lowest permissible level allowed; had failed to comply with its Clean Water Act permit for 6 out of the previous 12 quarters, and was currently in violation of its Clean Water Act Permit. As recently as June 10, 2024, the Environmental Protection Agency confirms that Defendant's Clean Water Act Compliance Status was "Violation Identified" and its violations were and are therefore ongoing.

5. This is not the first time Defendant has disregarded its Clean Water Act obligations. Defendant's Aitkin Peat Mine has a history of violating applicable wastewater mercury standards.

6. There is no evidence that Defendant has modified its pH related waste-water treatment equipment, or implemented any modifications to its pH related waste-water treatment plant policies, procedures or practices between June 30, 2022 and the present date.

7. This action seeks relief including, but not necessarily limited to, a declaration that Defendant has and continues to violate the terms of its Clean Water Act National Pollutant Discharge Elimination System (NPDES) permit; an order requiring Defendant to comply with the Clean Water Act and its NPDES permit; an order assessing the maximum penalties available under the law against Defendant for each day it has and continues to violate the terms of its NPDES permit; an award to Plaintiff of its costs of litigation including reasonable attorney's fees including monitoring fees; expert's fees; damages pursuant to Plaintiff's negligence claim; punitive damages; and such other relief as the Court deems appropriate.

## PARTIES

8. Plaintiff is an organization formed for the purpose of advocating for clean waterways, clean air, and the preservation of natural resources by seeking to ensure enforcement of the country's environmental laws.

9. Defendant is a Minnesota company. Defendant's Aitkin Peat Mine is located at 1303 Peat Plant Road, Cromwell, MN.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331.

11. Venue lies with this Court under 33 U.S.C. § 1365(c)(1) because the Facility at issue is located in this District.

## THE CLEAN WATER ACT

12. Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To achieve those goals, Section 301(a) of the CWA expressly prohibits the "discharge of any pollutant" where such discharges do not comply with the terms of any applicable NPDES permit. 33 U.S.C. §§ 1311(a), 1342.

13. "Discharge of a pollutant" means any "addition of a pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). Pollutant is defined to include "industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6). A point source is "any discernable, confined and discrete conveyance," 33 U.S.C. § 1362(14), and navigable waters are broadly defined as "the waters of the United States." 33 U.S.C. § 1362(7).

14. Once regulated by an NPDES permit, discharges must strictly comply with all of the terms and conditions of the permit. 40 C.F.R. § 122.41. Violation of the terms or conditions of and NPDES permit is a violation of the Clean Water Act. *Id.*

15. NPDES permit holders are required to prepare and submit discharge monitoring reports (DMR's) 40 C.F.R. § 122.41. Facilities report discharges on DMR's,

which their implementing authorities record into EPA databases. *See e.g., EPA Technical User Background Document for the Discharge Monitoring Report (DMR) Pollutant Loading Tool*, Version 1.0, January 2012.

16. Courts have repeatedly held that data reported in DMR's constitute admissions by the permittee and are sufficient to conclusively determine that a permit violation has occurred. Failure to file DMR's also constitutes a violation of the CWA. *See e.g, Sierra Club v. Simkins Industries, Inc*., 847 F.2d 1109 (4th Cir. 1998) (Defendant's failure to file DMR's requires Court to find Defendant violated its NPDES permit limitations for the entire three-year period it failed to do so).

17. Once a court has determined that a defendant has violated the CWA, it must impose civil penalties. *See e.g.  Atl. States Legal Found., Inc. v. Tyson Foods, Inc*., 897 F.2d 1128, 1142 (11th Cir. 1990).

18. Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4, each separate violation of the Clean Water Act subjects the violator to a penalty of up to $52,414 per day per violation for all violations after January 15, 2017 and before December 23, 2020; $54,460 per day per violation for all violations after December 23, 2020 and before January 12, 2022; $59,973 per day per violation for all violations after January 12, 2022 and before January 6, 2023; and $64,618 per day per violation for all violations after January 6, 2023. Every day a facility is operated in violation of its NPDES permit is a separate and distinct violation of the permit and the CWA. *Natural Resources Defense Council v. Southwest Marine,* 236 F.3d 985 (9th Cir. 2000).

19. In addition to civil penalties, the CWA provides for appropriate injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. §1365(a) and (d), declaratory relief. Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), permits prevailing parties or substantially prevailing parties to recover costs, including attorneys' and experts' fees associated with this enforcement action.

## CWA CITIZEN SUIT PROVISION

20. Section 505 of the CWA authorizes citizens to bring suit against any person who is "alleged to be in violation" of an effluent standard or limitation under the CWA. 33 U.S.C. § 1365(a). Effluent limitation is defined broadly to include "a[n] [NPDES] permit or condition thereof issued under section 1317 of this title," and "any unlawful act under subsection (a) of 1311 of this title." 33 U.S.C. § 1365 (f).

21. 33 U.S.C. § 1365(b), requires that 60 days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), citizens must give notice of their intention to sue. Notice must be given to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the state in which the violations are occurring, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2. The purpose of the notice requirement is to allow the parties to negotiate and resolve the dispute before litigation is commenced. *New Mexico Citizens for Clean Air and Water v. Espanola Mercantile Co., Inc*., 72 F.3d. 830, 833 (10th Cir. 1996).

22. Courts apply a five-year statute of limitations for Citizens seeking to enforce the Clean Water Act. *Pub. Interest Research Grp. of N.J., Inc. v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 75 (3d. Cir. 1990), *cert. denied*, 489 U.S. 1109 (1991).

## DEFENDANT'S POLLUTION AND REPEATED VIOLATIONS OF ITS CLEAN WATER ACT PERMIT

23. Defendant discharges wastewater into the Kettle River pursuant to its NPDES permit No. MN0055662.

24. Defendant's Aitkin Peat Mine and the Kettle River are located just a short drive from Interstate Highway 35 and in close proximity to Minnesota Highway 210, the Fon du Lac State Forest, the Sawyer State Wildlife Area, the Kettle Lake State Wildlife Management Area, and the Carl Sandell Wildlife Management Area.

25. Defendant's NPDES permit strictly limits the amount of allowable pollutants Defendant's wastewater can contain including the permissible range of Defendant's wastewater pH levels before it can be discharged. But despite its strict NPDES permit limits, Defendant has, for years, repeatedly and on an ongoing basis, dumped wastewater into the Kettle River with pollutant levels that violate its NPDES pH permit limits, which permit exceedances are in turn violations of the Clean Water Act.

26. The particular violations at issue in this case are set forth on the CWA pre-suit notice letter discussed below.

**PLAINTIFF'S PRE-SUIT NOTICE**

27. On August 5, 2024, in accordance with 33 U.S.C. § 1365(b)(1)(A), Plaintiff provided its notice of intent to file suit under the Federal Clean Water Act (60-Day Notice Letter) to the Administrator of the Environmental Protection Agency (EPA), the Regional Administrator of EPA Region 5, the Commissioner of the Minnesota Pollution Control Agency, and to Defendant.

28. The 60-Day Notice Letter (attached as Exhibit A hereto) provided Defendant with sufficient information to determine the CWA requirements Plaintiff alleges Defendant violated, the activity alleged to constitute the violations, sufficient information to determine the date, location and person responsible for the violations, and the contact information for Plaintiff and Plaintiff's counsel. Among other things, the 60-Day Notice letter identified and attached EPA records documenting three hundred sixty-three (363) days between June 30, 2022, and February 29, 2024, upon which Defendant exceeded its pH NPDES permit limits by discharging wastewater with pH levels exceeding the lowest permissible level allowed.

29. The Notice Letter also advised Defendant that EPA records designate the Facility's current CWA compliance status as "Violation Identified" and show that the Facility has been designated as Non-complaint with its CWA permit for 6 of the last 12 quarters.

30. As recently as June 10, 2023, the EPA records confirm that Defendant's Clean Water Act Compliance Status was "Violation Identified." A copy of these EPA records is attached as Exhibit B hereto.

31. Following receipt of the 60-Day Notice Letter, Defendant solicited a settlement proposal from Plaintiff, inducing Plaintiff to believe Defendant had a legitimate interest in taking steps to address this claim and Defendant's CWA violations and pollution of the Kettle River and to provide a settlement proposal to Defendant.

32. Unbeknownst to Plaintiff, Defendant also communicated directly with the Minnesota Pollution Control Agency and "two experts."

33. Plaintiff was not told that this communication was to take place.

34. Plaintiff was not privy to or permitted to participate in the communication.

35. After inducing Plaintiff to delay the filing of this matter so that a cooperative resolution could be explored and surreptitiously communicating with the MPCA and "two experts," Defendant advised Plaintiff that it had no interest working together with Plaintiff towards a resolution of this matter.

36. In correspondence dated May 17, 2024 Defendant responded to Plaintiff's 60-Day notice letter with a 140-page screed laden with improper ad hominem attacks, news articles regarding Plaintiff's counsel, and duplicative copies of documents. (Defendant 140-Page Letter). Defendant's 140-page letter also announced to Plaintiff that Defendant would not be attempting to identify and address the root cause of its repeated, long-standing, and ongoing violations of the CWA, nor attempting to resolve this matter amicably and without the need to proceed with litigation.

37. According to the 140-Page Letter, the EPA records and EPA data upon which Plaintiff's 60-Day Notice Letter is based (which were derived from Defendant's own DMR's), were "demonstrably incorrect because the [the EPA records and data] does not,

as shown below, take into account background levels as permitted by Minn. R. 7050.0170's Natural Water Quality Rule." The MPCA, Defendant claimed, was fully supportive of its position.

38. The timing of the MPCA's response, and the fact that Plaintiff was excluded from Defendant's interactions with the MPCA suggests that Defendant facilitated and requested that the MPCA support its position.

39. The position of Defendant, and apparently that of the MPCA and Defendant's "two experts," that state water quality standards have any relevance to, or somehow limit the federal CWA NPDES limits at issue here is a legal fallacy.

40. Nothing in the 140-page letter indicates or in any way suggests that the alleged violations have been fully addressed and are not ongoing within the meaning of applicable law.

41. Nothing in the 140-page letter indicates or in any way suggests that the MPCA has imposed penalties on Defendant for its unlawful pollution at issue here.

42. Nothing in the 140-page letter indicates or in any way suggests that the MPCA has required any remedial steps to ensure Defendant's future compliance with the CWA.

43. There is no evidence that Defendant has modified its waste-water treatment equipment or implemented any modifications to its plant policies, procedures or practices between April 5, 2024 and the present date.

## STANDING

44. Plaintiff's membership includes at least one individual who has visited and enjoyed the natural beauty and quietude of the area in immediate proximity to Defendant's Aitkin Peat Mine. Defendants repeated unlawful dumping of pollution herein described lessens the aesthetic and recreational values of the area and diminishes this person's enjoyment of the area.

## COUNT I
## THE CLEAN WATER ACT

45. Plaintiff restates and realleges all of the foregoing as if set forth here in full.

46. Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." To achieve those goals, the CWA expressly prohibits the "discharge of any pollutant" where such discharges do not comply with the terms of any applicable NPDES permit.

47. Once regulated by an NPDES permit, discharges must strictly comply with all of the terms and conditions of the permit.

48. Violation of the terms or conditions of and NPDES permit is a violation of the Clean Water Act.

49. In addition to specific effluent limitations, a Facility's NPDES permit also requires that the permit holder "shall at all times properly operate" the Facility and in accordance with an asset management program which includes adequate funding, operator staffing and training, rehabilitation and replacement of assets when necessary.

50. Every day a facility is operated in violation of its NPDES permit is a separate and distinct violation of the permit and the CWA.

51. The CWA authorizes citizens to bring suit against any person who is "alleged to be in violation" of an effluent standard or limitation under the CWA.

52. The CWA provides for appropriate injunctive relief preventing further violations of the Clean Water Act, mandatory civil penalties, declaratory relief, and also allows a prevailing plaintiff to recover costs, including attorney's fees including monitoring fees and experts' fees associated with a citizen enforcement action.

53. Exhibit A hereto identifies a list of the NPDES effluent limit exceedances Plaintiff seeks to redress under the CWA in this case, together with such additional violations as may be hereafter discovered.

54. Exhibit A is derived from the Facility's self-reported Discharge Monitoring Reports, as provided to the EPA.

55. Each of the effluent limit exceedances identified in Exhibit A are violations of the Facilities NPDES permit and, in turn, are therefore violations of the CWA.

56. Defendant's violations of its NPDES permit are continuing, ongoing, and recurring.

## COUNT II
## NEGLIGENCE

57. Plaintiff restates and realleges all of the foregoing as if set forth here in full.

58. Defendant negligently and improperly constructed, maintained and/or operated its waste-water treatment facility.

59. A properly constructed, operated, and maintained wastewater treatment plant will not pollute by repeatedly dumping wastewater laden with unlawful pH levels in violation of the Clean Water Act; will not violate its Clean Water Act permit on three hundred sixty-three (363) days between June 30, 2022, and February 29, 2024; and will not fail to comply with its Clean Water Act permit for 6 out of the previous 12 quarters.

60. The conduct of Defendant constitutes gross negligence and reflects a substantial lack of concern for and deliberate indifference to whether an injury resulted to Plaintiff.

61. Defendant's gross negligence was malicious and made with a wanton or reckless disregard for the safety of Plaintiff, which entitles Plaintiff to an award of nominal, compensatory, exemplary, and punitive relief.

## RELIEF REQUESTED

**WHEREFORE**, Plaintiff respectfully requests that this Court:

a. Declare Defendant to have violated and to be in violation of the Clean Water Act and the Facility's NPDES permit by committing each of the violations described above, including similar violations that occur after the filing of this Complaint;

b. Order Defendant to engage the services of an independent and qualified individual or entity to conduct a root cause analysis specific to the violations at issue in this matter;

c. Order Defendant to prepare and submit a plan to, and for the review and approval of, the EPA to address the specific violations at issue here and ensure they will not continue to recur;

d. Require Defendant to engage the services of an independent and qualified individual or entity to evaluate and revise Defendant's facility's best management practices plan (BMPP) consistent with the EPA Guidance Manual for Development of Best Management Practices for NPDES permittees;

e. Require Defendant to consult with the EPA regarding its evaluation of its BMPP and obtain their review and approval of the same;

f. Require Defendant to implement the recommendations of its BMPP consultant and the EPA;

g. Order Defendant to implement such other measures as the Court may deem necessary to remedy, mitigate, or offset the harm to the environment caused by the violations alleged above;

h. Determine the number of days of violation committed by Defendant;

i. Assess an appropriate civil penalty against Defendant for each day of violation of the Clean Water Act and the NPDES permit, as provided by 33 U.S.C. § 1319(d);

j. Order Defendant to comply with the Clean Water Act and Defendant's NPDES permit, and to refrain from further violations of the effluent standards and limitations in the permit;

k. Award Plaintiff its costs of litigation (including reasonable attorney and expert witness fees including monitoring fees); as provided by 33 U.S.C. § 1365(d);

l. Award Plaintiff nominal, compensatory, and punitive damages; and

m. Award such other relief as the Court deems appropriate.

Dated: June 12, 2024

                    **THRONDSET MICHENFELDER, LLC**

                    By: */s/Patrick W. Michenfelder*
                    Patrick W. Michenfelder (#024207X)
                    Chad A. Throndset (#0261191)
                    Jason Gustafson (#0403297)
                    80 South 8th Street, Suite 900
                    Minneapolis, MN 55402
                    Tel: (763) 515-6110
                    Fax: (763) 226-2515
                    pat@throndsetlaw.com
                    chad@throndsetlaw.com
                    jason@throndsetlaw.com

                    *Attorneys for Plaintiff*