## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Citizens for a Clean Environment, LLC, | Court File No. 24-cv-02253-ECW |
| Plaintiff, | **DEFENDANT AITKIN AGRI-PEAT, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS FED. R. CIV. P 12(c) MOTION FOR JUDGMENT ON THE PLEADINGS** |
| v. | |
| Aitkin Agri-Peat, Inc., | |
| Defendant. | |

## INTRODUCTION

Pursuant to Fed. R. Civ. P. 12(c), Defendant Aitkin Agri-Peat, Inc. (AAPI) seeks a judgment on the pleadings in its favor and against Plaintiff Citizens for a Clean Environment, LLC's (CCE) 33 U.S.C. § 1365(a)-authorized Clean Water Act (CWA) citizen's suit regarding its facility located at 1303 Peat Plant Road, Cromwell, Minnesota, 55726 (Facility).[1] CCE's CWA citizen's suit against AAPI is exclusively based on the Facility's alleged pH violations of its National Pollutant Discharge Elimination System (NPDES) Permit No. MN0055662 (NPDES Permit) (*see* Palermo Dec., Ex. 1 at 41-86[2];

---

[1] Though it moves for relief under Fed. R. Civ. P. 12(c) because this Court has, at all relevant times, lacked subject matter jurisdiction over this case, AAPI alternatively moves herein for summary judgment pursuant to Fed. R. Civ. P. 56.

[2] Because it is (1) a publicly-available document, (2) repeatedly referenced in CCE's Complaint (ECF No. 1 ¶¶ 7, 23, 25, 28, 39, 53 and 55-56) and (3) determinative of this Court's subject matter jurisdiction over CCE's CWA-authorized citizen's suit against AAPI, the Facility's NPDES Permit is properly before this Court for AAPI's Rule 12(c) motion. *Mills v. City of Grand Forks*, 614 F.3d 495, 498 (8th Cir. 2010) (for judgment on the pleadings, "[t]he court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record" (quoting *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999)); *see also Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) ("materials embraced by the complaint

*see also* ECF No. 1 ¶ 25 (the Facility "has, for years, repeatedly and on an ongoing basis, dumped wastewater into the Kettle River with pollutant levels that <u>violate the NPDES pH permit limits</u>, which permit exceedances are in turn violations of the Clean Water Act" (emphasis added))), which was issued to it by the U.S. Environmental Protection Agency (EPA)-delegated Minnesota CWA regulator — *i.e.,* the Minnesota Pollution Control Agency (MPCA).[3] And CCE's <u>only</u> proof of the Facility's alleged pH violations of its NPDES Permit is its then-existing, though since corrected, "Violation Identified" status on EPA's Compliance History Online website — *i.e.*, EPA ECHO. ECF No. 1 ¶¶ 4, 29-30; ECF Nos. 1-1, 1-2.

---

include 'documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings'" (quoting *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012)); *Drydal v. Enbridge (U.S.), Inc.*, 738 F. Supp. 2d 927, 930 (D. Minn. 2010) (Kyle, J.) ("a factual attack depends upon the resolution of facts in order to determine whether subject-matter jurisdiction exists; a court may rely upon matters outside the pleadings when considering such an attack, and the non-moving party does not receive the benefit of Rule 12(b)(6)'s safeguards"). And, though CCE's Complaint <u>only</u> alleges that AAPI violated its NPDES Permit "between June 30, 2022, and February 29, 2024" (ECF No. 1 ¶ 4), AAPI also produced, at CCE's request, a copy of its NPDES Permit that was in effect from August 9, 2013 to May 1, 2022 (*see* Palermo Dec., Ex. 2). To the extent this earlier permit is relevant (which it should not be), it is also properly before this Court because it is a publicly-available document.

[3]     On June 30, 1974, EPA authorized MPCA to issue NPDES permits in Minnesota. *Mississippi River Revival, Inc. v. Administrator, U.S. EPA*, 107 F. Supp. 2d 1008, 1012 (D. Minn. 2000) (Aslop, J.) (citing 33 U.S.C. § 1342(b)-(c)). That approval is codified under Minnesota law. *Id.* (citing Minn. Stat. § 115.03, subd. 1(e), this Court explained that MPCA "is hereby given and charged with the following powers and duties . . . [t]o adopt, issue, reissue, modify, deny, or revoke, enter into or enforce reasonable . . . permits . . . in order to prevent, control or abate water pollution," and MPCA "<u>shall have the authority to perform any and all acts minimally necessary . . . to the participation by the state of Minnesota in the National Pollutant Discharge Elimination System</u>" (emphasis added)).

This Court's grant of AAPI's Rule 12(c) motion is compelled by the applicability of 33 U.S.C. § 1342(k)'s CWA "permit shield" defense. That is, pursuant to the CWA "permit shield," "[c]ompliance with a permit issued pursuant to this section <u>shall be deemed compliance</u>." (Emphasis added). And, as (1) <u>proven</u> by the Facility's Discharge Monitoring Report (DMR) values for pH on the EPA ECHO attached to CCE's Complaint (ECF Nos. 1-1, 1-2), (2) explained by AAPI on May 17, 2024 (Palermo Dec., Ex. 1 at 1-5[4]), with its inclusion therein of two qualified and uncontroverted expert opinions from May 10, 2024 (*id.,* Ex. 1 at 25-26) and May 15, 2024 (*id.,* Ex. 1 at 27-32), during the 33 U.S.C. § 1365(b)-required 60-day notice (60-Day Notice) period and (3) <u>pronounced</u> by EPA's October 2024 correction to the EPA ECHO to show the Facility's full compliance at all relevant times with its NPDES Permit (EPA's October 2024 Corrected EPA ECHO) (*id.*, Ex. 3[5]), the

---

[4]    Because it is (1) repeatedly referenced throughout the Complaint (ECF No. 1 ¶¶ 36-37 and 40-42), (2) determinative of this Court's subject matter jurisdiction over CCE's CWA-authorized citizen's suit against AAPI and (3) precisely what was Congressionally-encouraged during the 60-Day Notice period, AAPI's "140-page letter" with attachments, including its two expert opinions, is thus properly before this Court for AAPI's Rule 12(c) motion (*see* above n.2). Indeed the CWA-required 60-Day Notice is intended to foster just such exchanges between the parties and the regulators to avoid, as here, erroneous or unnecessary CWA citizen's suits. *Hammes v. City of Davenport*, 381 F. Supp. 3d 1038, 1042 (S.D. Iowa 2019) ("This treatment of the notice requirement <u>advances three legislative aims</u>: (1) it furthers Congress's goal of balancing 'the benefit of encouraging citizen enforcement of environmental regulations against the problems encountered when excessive numbers of citizen suits are filed in the federal courts'; (2) it 'allow[s] governmental agencies to take responsibility for the enforcement of environmental laws and regulations, eliminating the need for multiple citizen suits'; and (3) it 'provide[s] an alleged violator the opportunity to attempt compliance with its permit restrictions, thereby avoiding litigation based on the alleged violation'" (emphasis added)).

[5]    Because it is (1) a publicly-available document, (2) determinative of this Court's subject matter jurisdiction over CCE's CWA citizen's suit against AAPI and (3) a continuation of what was Congressionally-encouraged during the 60-Day Notice period,

Facility has been at all relevant times in full compliance with its NPDES Permit, thus "shield[ing]" AAPI from CCE's CWA citizen's suit against it.[6]

## BACKGROUND

### A.    REGULATORY FRAMEWORK

#### 1.    The CWA

Pursuant to 33 U.S.C. §§ 1311(a), 1342 and 1342(k), the CWA expressly prohibits the "discharge of any pollutant" where such discharges do not comply with the terms of any applicable NPDES permit. And, pursuant to 33 U.S.C. § 1365(a), the CWA authorizes the bringing of a CWA citizen's suit against any person who is "alleged to be in violation" of a CWA-imposed effluent standard or limitation. But, under 33 U.S.C. § 1342(k), the CWA includes a "permit shield," which states that "[c]ompliance with a permit issued pursuant to this section <u>shall[ 7 ] be deemed compliance</u>." (Emphasis and bracketed information added).

---

EPA's October 2024 Corrected EPA ECHO is properly before this Court for AAPI's Rule 12(c) motion. *See* above nn.2 and 4.

[6]    AAPI's current compliance status can be accessed at https://echo.epa.gov/ by entering "Cromwell" into the "Quick Search" location tool bar and selecting the "AITKIN AGRI-PEAT INC - CROMWELL" Facility.

[7]    "'Shall' is generally interpreted as imposing a mandatory duty." *See Save the Valley, Inc. v. U.S. E.P.A.*, 99 F. Supp. 2d 981, 984 (S.D. Ind. 2000) ("[i]t is a well-accepted rule of statutory construction that a legislature's use of the word <u>'shall' is generally interpreted as imposing a mandatory duty</u>" (emphasis added)); Minn. Stat. § 645.44, subd. 16 ("'Shall' is mandatory").

2.    **The EPA ECHO**

The EPA ECHO is a web tool developed and maintained by EPA's Office of Enforcement and Compliance Assurance for public use and provides environmental regulatory compliance and enforcement information for over one million regulated facilities nationwide. *U.S. Environmental Protection Agency, ECHO*: Frequently Asked Questions,    https://echo.epa.gov/resources/general-info/echo-faq#what_is_echo    (last visited Sept. 30, 2024). The EPA ECHO's "Known Data Problems" webpage cautions that, "[g]iven the complexity of transactions, occasional problems occur with the migration of data into national systems. This page lists known data quality problems with larger sets of data." Palermo Dec., Ex. 4 at 1 (emphasis added).[8] And, as it relates specifically to such "problems" regarding Minnesota facilities, this webpage further cautions that, "[w]here discrepancies still exist, they are often beyond the control of the MPCA because they are related to the procedures by which the ECHO database aggregates and assess the data stored in the standalone program systems . . . the information presented through the dashboard will *not* be [(1)] complete, [(2)] current, and/or [(3)] accurate." *Id*., Ex. 4 at 4 (emphasis and bracketed information added).

---

[8]    Because it is (1) determinative of this Court's subject matter jurisdiction over CCE's CWA-authorized citizen's suit against AAPI and (2) a publicly-available document, the EPA ECHO's "Known Data Problems" webpage excerpts are properly before this Court for AAPI's Rule 12(c) motion. *See* above nn.2 and 4.

**B.    PARTIES**

**1.    <u>CCE</u>**

CCE, which was organized by CCE's counsel Chad Throndset, describes itself as "an organization formed for the purpose of advocating for clean waterways, clean air, and the preservation of natural resources by seeking to ensure enforcement of the country's environmental laws." ECF No. 1 ¶ 8.

**2.    <u>AAPI</u>**

AAPI is a golf/sports turf and horticulture peat supply company. AAPI's peat is harvested at the Facility. EHS Compliance Inc.'s (EHS) President Steve Zoubek (Zoubek) works with MPCA and EPA to ensure the Facility's compliance with all local and federal regulations, including its NPDES Permit.

**C.    THE FACILITY'S NPDES PERMIT**

On May 1, 2022, MPCA issued to AAPI a NPDES Permit for the Facility with the goal of "reduc[ing] pollutant levels in point source discharges and protect[ing] water quality in accordance with the U.S. Clean Water Act, Minnesota statutes and rules, and federal laws and regulations." Palermo Dec., Ex. 1 at 42. Consistent therewith, the Facility's NPDES Permit § 5.19.162 ("**Incorporation by Reference**") explicitly provides that "[t]his permit incorporates the following applicable federal and state laws applicable to the Permittee and enforceable parts of this permit: 40 CFR pts. 122.41, 122.42, 136, 403 and 503; Minn. R. chs. 7001, 7041, 7045, 7050, 7052, 7053, 7060, and 7080; and Minn. Stat. chs. 115 and 116. [Minn. R. 70010]." Palermo Dec., Ex. 1 at 64.

In order to monitor its impact on the environment, the Facility's NPDES Permit establishes monitoring stations at the Facility, which allow AAPI to monitor, among other things, both (1) the "background site conditions" — *i.e.*, the conditions of the natural water flowing <u>to</u> the Facility from the surrounding area, including the surrounding water's pH "background levels" (*id.*, Ex. 1 at 44) — and (2) the conditions of the "discharges" from the Facility — *i.e.*, the conditions of the waste-water flowing <u>from</u> the Facility, including the waste-water pH discharge levels (*id.*, Ex. 1 at 44-45). Pursuant to the Facility's NPDES Permit §§ 5.1.4, 5.3.4, 5.5.4, 5.7.4, 5.9.4, 5.10.4, 5.11.4 and 5.12.4, which repeatedly cites to and incorporates Minn. R. 7001.0150, subp. 2(B)[9] (*id.*, Ex. 1 at 49-51 ("[p]ermittee shall submit monitoring results in accordance with the limits and monitoring requirements for this station" (citing Minn. R. 7001.0150, subp. 2(B))), the Facility's monthly DMRs are

---

[9]    Minn. R. 7001.0150, subp. 2(B) provides, in full, as follows:

B. Requirements for monitoring and testing and reporting of monitoring and testing results. Monitoring and testing requirements must specify the type, interval, and frequency of monitoring and testing activities that are sufficient to yield representative data <u>to determine whether there is compliance with the terms and conditions of the permit or compliance with Minnesota and federal pollution control statutes and rules</u>. As appropriate, the permit must contain requirements for the proper use, maintenance, and installation of monitoring and testing equipment or methods. The permit must require the permittee to keep accurate records of monitoring and testing activities and to submit to the commissioner periodic reports of monitoring results required by the permit and, as requested by the commissioner, the results of other monitoring and testing undertaken by the permittee that are related to compliance with the terms and conditions of the permit or compliance with Minnesota and federal pollution control statutes and rules. Reporting of monitoring results must contain the certification in part 7001.0070.

(Emphasis added).

submitted to MPCA for the previously-approved monitoring stations, and MPCA then transmits the Facility's DMRs to the EPA for reporting on the EPA ECHO.

The pH limit in the Facility's NPDES Permit is the only condition at issue in this lawsuit. As required by Minn. R. 7050.0220 ("**SPECIFIC WATER QUALITY STANDARDS BY ASSOCIATED USE CLASSES**"), the Facility's NPDES Permit provides that the "[**d**]ischarge limitation[]" for pH is, for the minimum, "6.5" "standard units" (SU). Palermo Dec., Ex. 1 at 78, 80, 82-83 (also identifying the maximum as "8.5" SU). Importantly, however, the Facility's NPDES Permit §§ 5.18.96, 5.19.162 and 5.19.164 repeatedly cite to Minn. R. ch. 7050 and thus incorporate Minn. R. 7050.0170 ("**NATURAL WATER QUALITY**"). *See id.*, Ex. 1 at 57 and 64. And Minn. R. 7050.0170 unambiguously provides, in relevant part, as follows:

> The <u>waters of the state may, in a natural condition, have water quality characteristics or chemical concentrations approaching or exceeding the water quality standards</u>. Natural conditions exist where there is no discernible impact from point or nonpoint source pollutants attributable to human activity or from a physical alteration of wetlands. Natural background levels are defined by water quality monitoring. Where water quality monitoring data are not available, background levels can be predicted based on data from a watershed with similar characteristics.
>
> \*        \*        \*
>
> <u>Where background levels exceed applicable standards, the background levels may be used as the standards for controlling the addition of the same pollutants from point or nonpoint source discharges in place of the standards.</u>

(Emphasis added). In other words, if the "background levels" of the water surrounding a facility "exceed applicable standards," then Minn. R. 7050.0170 authorizes a permittee to use this actual "background level[]" "as the standard[]" control to measure the same

pollutants in the discharged water from the Facility. Thus, Minn. R. 7050.0170 ensures that a permittee is responsible for its "discharges," not the "background levels."

Here, the pH "background levels" of the Facility's water sampling locations (*i.e.*, the water flowing to the Facility) ranges from 3.7 to 4.24 SU for each of the days it was sampled (*see* Palermo Dec., Ex. 1 at 25-26), and thus is outside of the "applicable standard" of 6.5 SU for the minimum pH level for each of the days. Consistent, then, with Minn. R. 7050.0170, the pH "background levels" between 3.7 and 4.24 SU for each of the days are used as the minimum "controls" "of the same pollutant[] . . . discharges in place of the [6.5 SU] standard[]." And, as explained in more detail below, the Facility's pH discharge levels ranged from 5.0 to 6.2 SU on each of these days, which is above the 3.7 to 4.24 SU *minimum* control, thus leaving AAPI in compliance with its NPDES Permit's pH discharge limitations.

### D.    PRE- SUIT COMMUNICATIONS BETWEEN THE PARTIES

#### 1.    CCE's April 5, 2024 notice to AAPI of its potential CWA citizen's suit against it

On April 5, 2024, AAPI received CCE's CWA-required 60-Day Notice — *i.e.,* "Notice of Violation and Intent to File Suit under the Federal Clean Water Act" with "Exhibit A" enclosed (CCE's April 5, 2024 Notice). ECF No. 1-1; *see also* Palermo Dec., Ex. 1 at 6-25. CCE's April 5, 2024 Notice sought relief for "ongoing and continuing violations of the Facility's NPDES [P]ermit." ECF No. 1-1 at 1 (bracketed information added). CCE's April 5, 2024 Notice argued that, because of the Facility's then-existing "Violation Identified" status on the EPA ECHO, the EPA ECHO conclusively proves —

without more — that (1) the Facility "has not been in compliance with the CWA for 6 out of the last 12 quarters," (2) the Facility has had "repeated substantial, [(a)] mercury, [(b)] nitrogen, [(c)] nitrate, [(d)] phosphorous, [(e)] carbon, and [(f)] suspended solids permit exceedances" and (3) the Facility has had "363 days with effluent exceedances in the previous five years." *Id*. at 3 (bracketed information added).

The following graphic shows the "Exceedance Details" that CCE relied (and still relies) upon to support its claim against AAPI:

### Exceedance Details

| Date ↑ | Outfall-Limit Set ↕ | Parameter ↕ | Average Daily Flow (MGD) ↕ | Statistical Base Type ↕ | DMR Value ↕ | Limit Value ↕ |
|---|---|---|---|---|---|---|
| 06/30/2022 | D003-A1 | 00400 - pH | -- | MO MIN | 6.20 SU | >= 6.5 SU |
| 06/30/2022 | D009-A1 | 00400 - pH | -- | MO MIN | 6.30 SU | >= 6.5 SU |
| 08/31/2022 | D009-A1 | 00400 - pH | -- | MO MIN | 6.40 SU | >= 6.5 SU |
| 11/30/2022 | D003-A1 | 00400 - pH | -- | MO MIN | 6.20 SU | >= 6.5 SU |
| 11/30/2022 | D009-A1 | 00400 - pH | -- | MO MIN | 5.70 SU | >= 6.5 SU |
| 04/30/2023 | D003-A1 | 00400 - pH | -- | MO MIN | 5 SU | >= 6.5 SU |
| 04/30/2023 | D009-A1 | 00400 - pH | -- | MO MIN | 5.60 SU | >= 6.5 SU |
| 05/31/2023 | D003-A1 | 00400 - pH | -- | MO MIN | 6.10 SU | >= 6.5 SU |
| 05/31/2023 | D009-A1 | 00400 - pH | -- | MO MIN | 6.40 SU | >= 6.5 SU |
| 01/31/2024 | D003-A1 | 00400 - pH | -- | MO MIN | 6.20 SU | >= 6.5 SU |
| 01/31/2024 | D009-A1 | 00400 - pH | -- | MO MIN | 6.30 SU | >= 6.5 SU |
| 02/29/2024 | D003-A1 | 00400 - pH | -- | MO MIN | 6.40 SU | >= 6.5 SU |

Palermo Dec., Ex. 1 at 21-22.

The fatal flaw with CCE's reliance on the EPA ECHO was (and is), however, that

the "Violation Identified" on the EPA ECHO does <u>not</u> constitute an automatic violation

because, as discussed above, its "dashboard <u>will not be complete, current, and/or accurate</u>." *See* Palermo Dec., Ex. 4 at 4 (emphasis added). More specifically, the EPA ECHO does not automatically consider the individual NPDES permit terms or the state laws incorporated therein, such as Minn. R. 7050.0170's reference to the "background levels" "as the standards for controlling the addition of the same pollutants." Because the EPA ECHO does not automatically consider such permit terms when it determines its "**Compliance Status**" (or "**Facility-Level Status**"), the Facility's then-existing "Violation Identified" status on the EPA ECHO was demonstrably incomplete and inaccurate. That is, as shown in the above graphic, the pH minimum "Limit Value" was the standard 6.5 SU — <u>not</u> 3.7 to 4.24 SU as it should have been — and thus clearly failed to factor in the Facility's pH "background levels" as authorized by its NPDES Permit §§ 5.18.96, 5.19.162 and 5.19.164. Because the "DMR Values" identified above (*i.e.,* 5.0 to 6.4) were <u>below</u> the minimum 6.5 SU for each date, this resulted in an automatic — though erroneous — violation (and thus in violation of the CWA). In reality, however, the pH minimum "Limit Value" is — due to the "background levels" — between 3.7 to 4.24 SU (*see* Palermo Dec., Ex. 1 at 25-26), and thus the "DMR Values" identified above (*i.e.*, 5.0 to 6.4) are <u>above</u> this minimum and thus in compliance with its NPDES Permit.

**2.** **AAPI's April 19, 2024 response to CCE's April 5, 2024 Notice**

On April 19, 2024, AAPI, through Zoubek, responded to CCE's April 5, 2024 Notice

(AAPI's April 19, 2024 Response to Notice). Palermo Dec., Ex. 5.[10] AAPI's April 19, 2024

Response to Notice was, in full, as follows:

> Dear Mr. Michenfelder:
>
> I write on behalf of Aitkin Agri-Peat (dba Peat, Inc.) regarding your letter dated April 5, 2024, with the intent to file suit under the Clean Water Act ("CWA"). EHS Compliance, Inc. assists Peat, Inc. ("the company") with activities related to environmental, health and safety. I am in the process of gathering and reviewing the information provided in your letter from EPA ECHO and comparing it to our own submissions. In our conversations, I can provide details that will help the Citizens for a Clean Environment ("CCE") understand the challenges and changes that have evolved to ensure safety and compliance.
>
> Peat, Inc. is a good steward of our environmental resources. Their business relies on quality products from the land.
>
> The company accepts the invitation to discuss [(1)] permit changes, [(2)] actions already taken, [(3)] effective remedies and [(4)] future potential actions to ensure compliance.
>
> Please contact me with questions and comments. I will serve as your primary contact.
>
> Kind Regards
> Steve Zoubek

*Id.* (emphasis and bracketed information added).

---

[10]    Because it is (1) repeatedly referenced in the Complaint (ECF No. 1 ¶¶ 36-37 and 40-42) and (2) Congressionally-encouraged during the 60-Day Notice period, the April 19, 2024 Response to Notice is properly before this Court for AAPI's Rule 12(c) motion (*see* above nn.2 and 4).

13

### 3.  CCE's May 3, 2024 unsolicited settlement demand to AAPI

On May 3, 2024, CCE eschewed AAPI's above-discussed April 19, 2024 "accept[ance] [of] [CCE's April 5, 2024] invitation to discuss [(1)] permit changes, [(2)] actions already taken, [(3)] effective remedies and [(4)] future potential actions to ensure compliance." CCE did so by sending to AAPI that day an unsolicited settlement demand (CCE's May 3, 2024 Demand).[11] Palermo Dec., Ex. 1 at 95-96.

### 4.  AAPI's May 17, 2024 rejection of CCE's May 3, 2024 Demand

On May 17, 2024, AAPI rejected CCE's May 3, 2024 Demand (AAPI's May 17, 2024 Response to Demand). Palermo Dec., Ex. 1 at 1-5. AAPI's May 17, 2024 Response to Demand rejected CCE's May 3, 2024 Demand based on, as discussed below, (1) Zoubek's May 10, 2024 expert opinion to MPCA requesting that it rescind the Facility's "Violation Identified" status on the EPA ECHO because of the Facility's demonstrated full compliance with its NPDES Permit (May 10, 2024 Zoubek Opinion) (*id.*, Ex. 1 at 25-26) and (2) Barr Engineering, Inc.'s (Barr) Jim Aiken's (Aiken) May 15, 2024 expert opinion to AAPI that the Facility was in full compliance with its NPDES Permit (May 15, 2024 Aiken Opinion) (*id.*, Ex. 1 at 27-32).

More specifically, AAPI's May 17, 2024 Response to Demand gave the following two points for its rejection of CCE's May 3, 2024 Demand:

---

[11]    Because it is referenced in the Complaint (ECF No. 1 ¶ 31), CCE's May 3, 2024 Demand is properly before this Court (*see* above n.2), and AAPI's reference thereto does not violate Fed. R. Evid. 408.

**POINT NO. 1:** CCE'S ALLEGATIONS ARE EXCLUSIVELY BASED ON A DEMONSTRABLY FALSE PREMISE—I.E., THE ACCURACY OF THE ENVIRONMENTAL PROTECTION AGENCY'S (EPA) "ECHO" WEBSITE

CCE makes the following five allegations against AAPI:

(1)    AAPI has had ongoing and continuing violations of the Facility's permit;

(2)    AAPI has a repeated and ongoing failure to file mandatory Discharge Monitoring Reports;

(3)    The Facility has not been in compliance with the Clean Water Act for six out of the last 12 quarters;

(4)    The Facility has repeated substantial mercury, nitrogen, nitrate, phosphorus, carbon and suspended solids permit exceedances; and

(5)    The Facility has 363 days with effluent exceedances in the previous five years.

But, based on its April 5, 2024 Notice, CCE's only basis for these allegations is the "Violations Indicated" status on EPA Echo. Attach. A. The current status on EPA Echo is, however, demonstrably incorrect because EPA Echo does not, as shown below, take into account background levels as permitted by Minn. R. 7050.0170's Natural Water Quality Rule. It instead compares the sample pH levels to those allowed in the Permit. This is clear error. *When background levels exceed applicable standards, the Natural Water Quality Rule "permits the background levels to be used as the standards for controlling the addition of the same pollutants from point or nonpoint source discharges in place of the standards." Minn. R. 7050.0170.* And, in Minnesota, "[a]dministrative rules have the force and effect of law." *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 875 (8th Cir. 2022) (quoting *Minn. Energy Res. Corp. v. Comm'r of Revenue*, 886 N.W.2d 786, 801 (Minn. 2016) (citing Minn. Stat. § 270C.06 ("Rulemaking authority"); *U.S. W. Material Res., Inc. v. Comm'r of Revenue*, 511 N.W.2d 17, 20 n.2 (Minn. 1994)).

**POINT NO. 2: CCE'S ALLEGATIONS ARE REFUTED BY NOT ONLY (1) ITS EPA-DELEGATED STATE REGULATOR (I.E., THE MINNESOTA POLLUTION CONTROL AGENCY (MPCA)) BUT ALSO (2) AAPI'S TWO EXPERTS (I.E., ZOUBEK AND [BARR ENGINEERING'S JIM AIKEN (AIKEN))**

First, MPCA issued to AAPI its Permit for the Facility on May 1, 2022, and it authorizes AAPI to operate per the requirements of the Permit. These requirements make, as follows, numerous references to Minn. R. Ch. 7050:

(1)    5.18.96. The Permittee shall operate and maintain the [F]acility and shall control runoff, including stormwater, from the [F]acility to prevent the exceedance of water quality standards specified in Minnesota Rules, Chs. 7050 and 7060. [Minn. R. 7050, Minn. R. 7060].

(2)    5.19.162. Incorporation by Reference. This permit incorporates the following applicable federal and state laws applicable to the Permittee and enforceable parts of this permit: 40 CFR pts. 122.41, 122.42, 136, 403, and 503; Minn. R. Chs. 7001, 7041, 7050, 7052, 7053, 7060, and 7080; and Minn. Stats. Chs. 115 and 116. [Minn. R. 7001].

(3)    5.19.164. Toxic Discharges Prohibited. Whether or not this permit includes effluent limitations for toxic pollutants, the Permittee shall not discharge a toxic pollutant except according to 40 CFR pts. 400 to 460 and Minn. R. Chs. 7050, 7052, 7053, and any other applicable MPCA rules.

*This is critical because Minn. R. 7050.0170 permits the background levels to be used as the standards for controlling the addition of the same pollutants from point or nonpoint source discharges in place of the standards.* AAPI submits monthly water samples to Pace Analytical for testing. These results are submitted electronically using the MPCA eDMR system, which then updates the status on EPA Echo. *When applying the Natural Water Quality Rule, AAPI is in compliance with the Permit and has no violations.* Indeed, following CCE's April 5, 2024 Notice, MPCA confirmed to Zoubek that AAPI's Facility is in full compliance.

Second, AAPI's expert Zoubek has conducted an analysis in accordance with the Natural Water Quality Standards Rule, and he has determined AAPI is in compliance with the pH requirements. Attach. B. In addition to the demonstrably erroneous "Violations Indicated" on EPA Echo,

the EPA Discharge Point numbering system is not reflective of the discharge point numbers in the Permit. Based on its prior conversations with AAPI's expert Zoubek, MPCA is aware of this discrepancy, and AAPI has thus filed a formal request to MPCA for it to correct these errors. Attach. B.

*Id.,* Ex. 1 at 2-3 (italics added).

The May 10, 2024 Zoubek Opinion was, in relevant part, as follows:

Permit #MN0055662 has a hard limit for pH minimum of 6.5. However, the new permit dated May 2022 reflects a new and environemntally appropriate background water sampling location (SW005). Peat, Inc[.] is in compliance with the pH minimum per MN 7050.0170 Nautral Water Quality. "Where natural background levels exceed applicable standards, the background levels may be used as the standards for controlling the addition of the same pollutants from point or non-point souce discharges in place of the standards." In the table below, the pH of SW005 has a range of 3.7 to 4.24.

| Cromwell Station | Station Description | Mon End Date | Parameter | Limit | Rpt Value | Units |
|---|---|---|---|---|---|---|
| SW005 | Proposed Background Monitoring Stati | 6/30/2022 | pH | | 4.1 | SU |
| SW005 | Proposed Background Monitoring Stati | 7/31/2022 | pH | | 4 | SU |
| SW005 | Proposed Background Monitoring Stati | 8/31/2022 | pH | | 4 | SU |
| SW005 | Proposed Background Monitoring Stati | 9/30/2022 | pH | | 4 | SU |
| SW005 | Proposed Background Monitoring Stati | 10/31/2022 | pH | | 3.9 | SU |
| SW005 | Proposed Background Monitoring Stati | 11/30/2022 | pH | | 3.7 | SU |
| SW005 | Proposed Background Monitoring Stati | 12/31/2022 | pH | | 4.2 | SU |
| SW005 | Proposed Background Monitoring Stati | 4/30/2023 | pH | | 4.1 | SU |
| SW005 | Proposed Background Monitoring Stati | 5/31/2023 | pH | | 3.94 | SU |
| SW005 | Proposed Background Monitoring Stati | 6/30/2023 | pH | | 4.16 | SU |
| SW005 | Proposed Background Monitoring Stati | 7/31/2023 | pH | | 4.1 | SU |
| SW005 | Proposed Background Monitoring Stati | 8/31/2023 | pH | | 4.24 | SU |
| SW005 | Proposed Background Monitoring Stati | 9/30/2023 | pH | | 4.09 | SU |
| SW005 | Proposed Background Monitoring Stati | 10/31/2023 | pH | | 3.77 | SU |
| SW005 | Proposed Background Monitoring Stati | 11/30/2023 | pH | | 3.71 | SU |

The lowest pH from the discharge points SD003 (D003) and SD005 (D009) is 5.0. In any given month that indicates the discharge is below the permit hard limit for pH minimum, the actual discharge is well above the natural water quality background results. Therefore, Peat, Inc is in compliance with MN regulations.

| Date | D003 | D009 | SW005 | Units |
|------|------|------|-------|-------|
| 6/30/2022 | 6.2 | 6.3 | 4.1 | SU |
| 8/31/2022 | | 6.4 | 4 | SU |
| 11/30/2022 | 6.2 | 5.7 | 3.7 | SU |
| 4/30/2023 | 5 | 5.6 | 4.1 | SU |
| 5/31/2023 | 6.1 | 6.4 | 3.94 | SU |
| 1/31/2024 | 6.2 | 6.3 | No Flow | |
| 2/29/2024 | 6.4 | | No Flow | |

*Id.*, Ex. 1 at 25-26.

The Aiken Opinion gave four bases for Aiken's conclusion that the Facility is in full compliance with its NPDES Permit. <u>First</u>, Aiken refuted, as follows, CCE's misinterpretation of the Facility's "Violation Identified" status on EPA ECHO:

> This database entry is derivative and provides no actual evidence of violation. A programmer or algorithm has made an <u>assumption</u> of violation but there is no basis to believe on this indication alone that there is substance to this statement. For reference, these types of databases are often incomplete or inaccurate and must be vetted against actual data from the Site to ensure that the statement is correct. <u>As a professional matter, it would be inconsistent with the standard of care to assume that a summary entry such as "Violations Identified" represents anything other than an indication that further work is required</u> to answer the obvious question as to what the actual violation is that is alleged.

*Id.*, Ex. 1 at 29 (emphasis added). <u>Second</u>, Aiken refuted, as follows, CCE's allegation that the Facility "has not been in compliance with the CWA for 6 out of the last 12 quarters":

> Exhibit A does indicate the [F]acility has not been in compliance for 6 of the last 12 quarters but does not indicate what the compliance issue is. This again is derivative summary information and does not constitute evidence of non-compliance. Rather, <u>it is an assumption and does not constitute actual evidence of a permit exceedance</u>. This allegation is without merit and does not require further evaluation other than to evaluate the actual Site data as described below.

*Id*. (emphasis and bracketed information added). <u>Third</u>, Aiken refuted, as follows, CCE's allegation that the Facility has had "repeated substantial mercury, nitrogen, nitrate, phosphorous, carbon, and suspended solids permit exceedances":

> The Michenfelder letter claims there are exceedances of "Repeated substantial mercury, nitrogen, nitrate, phosphorus, carbon, and suspended solids". However, <u>Exhibit A does NOT indicate that the [F]acility has had repeated, substantial, or permit exceedances for any of the constituents listed</u>. For reference, pages 15-18 of Exhibit A include a summary of exceedances but all of the entries for the parameters above are listed as "0". Therefore, <u>this allegation is false and misleading</u>.

*Id*. (emphasis and bracketed information added). And, <u>fourth</u>, Aiken refuted, as follows, CCE's allegation that the Facility has had "363 days with effluent exceedances in the previous five years":

> The 12 listed exceedances are shown on page 16 and 17 of Exhibit A of CCE's Complaint and are all related to the parameter pH. The exceedances in question are all related to the pH limit…As shown in the DMR summary, the average pH value for the 16 events collected at SW005 is 4 s.u. with a range of 3.7 to 4.24 s.u. All of the values are below the default limit of 6.5 s.u. listed in the permit and used by EPA. <u>None of the 12 exceedances for any of the six events cited as in "Violation" are below the background values</u>. Therefore, <u>I conclude there is no violation, no exceedances of permit limits and that the Echo database data and the assertions based on it and included in the Michenfelder letter are in error</u>.

*Id*., Ex. 1 at 29-30 (emphasis added).

Based, then, on the above demonstration of the Facility's full compliance with its NPDES Permit, AAPI concluded its May 17, 2024 Response to Demand with the following:

> <u>AAPI's Facility is operating in full compliance with the Clean Water Act</u>. AAPI will, therefore, vigorously defend itself against CCE's filing of an action in support of its unsubstantiated allegations and attempts to extort payment to which it is not entitled, including (1) the filing of a Fed. R. Civ. P. 11 "Sanctions" Motion against CCE and Michenfelder and (2) the investigation into the legal legitimacy of CCE as a valid corporation entity

for the purpose of protecting its organizer and manager from liability arising from its actions.

*Id.*, Ex. 1 at 5 (emphasis added).

### E.    CCE'S JUNE 12, 2024 CWA CITIZEN'S SUIT

Despite being provided with this uncontroverted (and incontrovertible) proof of the Facility's full compliance with its NPDES Permit, CCE commenced on June 12, 2024 its CWA citizen's suit. CCE did so without substantively responding to or engaging (1) AAPI, (2) either of AAPI's two experts, (3) MPCA or (4) EPA on this proof of permit compliance. CCE also did so with the audacious criticism of AAPI for both (1) disclosing to MPCA CCE's allegations of the Facility's non-compliance with its NPDES Permit and (2) purportedly having solicited its May 3, 2024 Demand in bad faith.

#### 1.    <u>CCE's June 12, 2024 CWA citizen's suit contains four allegations against AAPI</u>

As it relates to the Facility's alleged pH violations of its NPDES Permit, CCE's June 12, 2024 CWA citizen's suit repeats the same allegations in its above-discussed April 5, 2024 Notice. *Compare* ECF No. 1 *with* ECF No. 1-1.[12] And, as with the allegations of the Facility's pH violations of its NPDES Permit in CCE's April 5, 2024 Notice, CCE's June 12, 2024 CWA citizen's suit is, as follows, based on the same four allegations:

---

[12]    Because (1) the Complaint continued to rely exclusively on the EPA ECHO and (2) the then-existing EPA ECHO made <u>no</u> mention of CCE's April 5, 2024 Notice's alleged "repeated substantial [(a)] mercury, [(b)] nitrogen, [(c)] nitrate, [(d)] phosphorus, [(e)] carbon and [(f)] suspended solids permit exceedances" (ECF No. 1-1 (bracketed information added)), CCE had to and did remove these accusations from its Complaint (ECF No. 1). But the Complaint inadvertently failed to strike therefrom its one remaining prior unsubstantiated allegation of "a history of violating applicable wastewater <u>mercury</u> standards." ECF No. 1 ¶ 5 (emphasis added).

(1)    The Facility's then-existing compliance status on the EPA ECHO is "Violation Identified" due to its pH levels;

(2)     The Facility has, per the EPA ECHO, a history of pH violations;

(3)    The Facility has, per the EPA ECHO, been CWA non-compliant with regard to pH for six out of the last 12 quarters; and

(4)    The Facility has, per the EPA ECHO, 363 days with pH violations in the previous five years.

ECF No. 1 ¶¶ 4-5.[13]

**2.    CCE's June 12, 2024 CWA citizen's suit also alleges that AAPI should _not_ have communicated with MPCA regarding CCE's allegations of the Facility's pH violations of its NPDES Permit**

In addition to failing to offer any basis for its allegations of the Facility's pH

violations of its NPDES Permit beyond citing to the Facility's then-existing "Violation

Identified" status on the EPA ECHO, CCE's CWA citizen's suit insinuates that it was

---

[13]    CCE's CWA citizen's suit does not challenge the Facility's NPDES Permit or otherwise allege that any of its provisions violate the CWA. CCE's CWA citizen's suit also does not allege either (1) any sort of preemption issue between the CWA and state law or (2) that Facility's NPDES Permit incorporates state requirements that are less stringent than federal requirements. This is presumably because none of these arguments persuade. Indeed, though it begins its Complaint by citing to EPA's overview of pH to seemingly suggest that Facility's pH levels are problematic (which they are demonstrably not), CCE fails to acknowledge EPA's disclaimer that "criteria or other benchmarks alone should not be used to exclude low pH as a cause," adding that "[d]ifferent species have different pH requirements, different sites have different naturally occurring levels of pH, and other agents may enhance the effects of pH." _See_ https://www.epa.gov/caddis/ph (emphasis added). Because of this, EPA clarifies that each "state, territory, and authorized tribe" has its own "state-specific water quality standards effective under the [CWA]." _See_ https://www.epa.gov/wqs-tech/state-specific-water-quality-standards-effective-under-clean-water-act-cwa. For Minnesota, this includes, among other regulations, Minn. R. chs. 7000 and 7050. There are, in fact, no applicable "federal" or "CWA" pH hard limits. Therefore, any (1) preemption argument or (2) suggestion that the standards under Facility's NPDES Permit, including its incorporation of Minnesota regulations relating to pH, make it less stringent _vis-à-vis_ federal law plainly fails.

improper for the permittee — *i.e.,* AAPI — to inform its permitter and regulator — *i.e.,* MPCA — of CCE's allegations of the Facility's pH violations of its NPDES Permit. ECF No. 1 ¶ 38 ("The timing of MPCA's response, and the fact the [CCE] was excluded from [AAPI's] interactions with the MPCA suggests that [AAPI] facilitated and requested the MPCA support its position" (bracketed information added)). But, as Congressionally-encouraged during the CWA-required 60-Day Notice period (*see* above n.4), the Facility's NPDES Permit "mandat[ed]" (*i.e.,* "shall") that AAPI notify MPCA of such non-compliance allegations. Palermo Dec., Ex. 1 at 67 § 5.19.193 ("**Effluent Violations**") ("If the Permittee discovers that noncompliance could endanger human health . . .[,] [AAPI] . . . shall . . . notify the Commissioner[14]" (emphasis and bracketed information added)); *id*. at 54 § 5.16.48 ("**Toxic Substance Reporting**") (AAPI "shall notify the MPCA immediately of any knowledge or reason to believe that an activity occurred that would result in the discharge of a toxic pollutant" (underlining and bracketed information added)).

**F.    AAPI'S JULY 5, 2024 ANSWER**

On July 5, 2024, AAPI filed its Answer to CCE's June 12, 2024 CWA citizen suit, which reiterated its above-discussed defenses thereto. ECF No. 6.

**G.    THE PARTIES' SEPTEMBER 9, 2024 JOINT RULE 26(f) REPORT**

On September 9, 2024, AAPI's "[c]oncise factual summary of [AAPI's] claims/defenses" to the parties' "**JOINT RULE 26(f) REPORT**" also reiterated its above-

---

14    "[T]he Commissioner" is defined therein as MPCA's commissioner. Minn. R. 7020.0300, subp. 7a.

discussed defenses to CCE's CWA citizen's suit. ECF No. 13 at 3 (bracketed information added).

## ARGUMENT

## I.   STANDARD OF REVIEW

### A.   Judgment on the pleadings standard

After the pleadings are closed, any party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). "In reviewing a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c), a court applies the same standard used in reviewing a motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6*)." Landmark Comm. Bank, N.A. v. JP Morgan Chase Bank*, *N.A.*, No. 12-cv-1103 (PJS/JJK), 2012 WL 4511185, at *2 (D. Minn. Oct. 2, 2012) (Schiltz, J.) (citation omitted). A judgment on the pleadings "serves to eliminate [pleadings] which are fatally flawed in their legal premises and designed to fail, thereby sparing litigants the burden of unnecessary pretrial and trial activity." *Young v. City of St. Charles*, 244 F.3d 623, 627 (8th Cir. 2001).

On such a motion, the court may consider (1) pleadings, (2) matters of public record, and (3) materials embraced by and exhibits attached to the pleadings. *Smithrud v. City of St. Paul*, 746 F.3d 391, 395 (8th Cir. 2014); *Landmark Comm. Bank, N.A.*, 2012 WL 4511185, at *2 (same). While "the court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor" (*Landmark Comm. Bank, N.A.*, 2012 WL 4511185, at *2), it need <u>not</u> either (1) "'blindly accept the legal conclusions drawn by the pleader from the facts'" or (2) accept "wholly conclusory allegations, or unwarranted factual inferences" (*Gisege v. Minn. Dep't of Corr.*, No. 06-cv-

1353 (JRT/RLE), 2007 WL 2892024, at **15-16 (D. Minn. Sept. 28, 2007) (Tunheim, J.)). Similarly, this Court need not accept factual allegations contradicted by documents referenced in the Complaint, as the referenced "documents control." *Bohan v. Honeywell Int'l, Inc.*, No. 02-cv-612 (JEL/JGL), 2002 WL 31767786, at *1 (D. Minn. Dec. 9, 2002) (Ericksen, J.) ("[i]f a document attached to the complaint contradicts the complaint's allegations, the document controls and the court need not accept as true the inconsistent allegations in the complaint" (citing *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991); *Sazerac Co. v. Falk*, 861 F. Supp. 253, 257 (S.D.N.Y. 1994))).

To avoid a judgment on the pleadings or dismissal, a claim must be "facially plausible," meaning that the "factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Cole v. Homier Distrib. Co.*, 599 F.3d 856, 861 (8th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009)). Although it need not contain "detailed factual allegations," a complaint must contain facts with enough specificity "to raise a right to relief above the speculative level." *Landmark Comm. Bank, N.A.*, 2012 WL 4511185, at *2 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Where this Court can infer from the factual allegations no more than a "mere possibility of misconduct," the complaint must be dismissed. *Id.* (citing *Iqbal*, 556 U.S. at 679). The requirement that a plaintiff plead sufficient facts "to provide the 'grounds' of his entitle[ment] to relief,' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (quoting *Twombly*, 550 U.S. at 555).

24

Applying this standard here, CCE's CWA citizen's suit against AAPI should be dismissed because the Facility is in full compliance with its NPDES Permit and thus "shielded" therefrom.

### B. Subject matter jurisdiction

This Court must examine jurisdiction allegations when challenged or when it otherwise finds it necessary. *Dart Cherokee Basin Operating Co. v. Owens*, 547 U.S. 81, 86-87 (2014); *Restrepo v. Best Buy Co.*, No. 14-cv-2603(JNE/JSM), 2014 WL 4639890, at *2 (D. Minn. Sept. 16, 2014) (Ericksen, J.). A court may consider a subject matter jurisdiction challenge on a Rule 12(c) motion. *Central States, Southeast and Southwest Areas Health and Welfare Fund v. Student Assur. Servs., Inc.,* No. 13-cv-1065 (ADM/FLN), 2014 WL 2009053, at 2 (D. Minn. May 16, 2014) (Montgomery, J.).

When evaluating subject matter jurisdiction, this Court "must distinguish between a 'facial attack' and a 'factual attack.'" *Penrod v. K&N Eng'g, Inc*., No. 18-cv-02907 (ECT/LIB), 2019 WL 1958652, at *2 (D. Minn. May 2, 2019) (Tostrud, J.) (citing *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990)). In a "facial attack," this Court assesses whether the complaint sufficiently alleges a subject matter jurisdiction basis; in a "factual attack," "the existence of subject matter jurisdiction is challenged in fact, irrespective of the pleadings, and matters outside the pleadings are considered." *Id*. (citing *Branson Label, Inc. v. City of Branson*, 793 F.3d 910, 914-15 (8th Cir. 2015) (additional citations omitted)). "In ruling on a motion to dismiss for lack of subject-matter jurisdiction, a court is free to weigh the evidence in order to decide whether that evidence establishes

that it has jurisdiction." *Hummel v. Minn. Dep't of Agric.*, 430 F. Supp. 3d 581, 586 (D. Minn. 2020) (Schiltz, J.) (citing *Osborn*, 918 F.2d at 730).

## II.   THE APPLICABILITY OF AAPI'S CWA "PERMIT SHIELD" DEFENSE DUE TO THE FACILITY'S DEMONSTRATED FULL "COMPLIANCE WITH [ITS] [NPDES] PERMIT"

### A.   The CWA's "permit shield" defense

For obvious and compelling public policy reasons, the CWA contains a "permit shield" defense. *See* U.S.C. § 1342 (k) ("**Compliance with permits**") ("[c]ompliance with a permit issued pursuant to this section <u>shall be deemed compliance for purposes of §1365 [a citizen suit]</u>" (emphasis added); *see also Piney Run Pres. Ass'n v. Cnty. Com'rs of Carrol Cnty.*, MD, 268 F.3d 255, 267 (4th Cir. 2001) ("[i]t is clear, therefore, that if a permit holder discharges pollutants precisely in accordance with the terms of its permit, <u>the permit will 'shield' its holder from CWA liability</u>" (emphasis added)); *Alaska Cmty. Action on Toxics v. Aurora Energy Servs., LLC*, 765 F.3d 1169, 1171 (9th Cir. 2014) (same); *Coon v. Willet Dairy, LP*, 536 F.3d 171, 173 (2d Cir. 2008) ("[c]ompliance with an authorized permit is deemed compliance with CWA, <u>so long as [the Defendant] was acting in accordance with its permit it could not be liable in a citizen suit for CWA violations</u>" (emphasis added)); *Wisconsin Resources Protection Council v. Flambeau Mining Co.*, 727 F.3d 700, 706 (7th Cir. 2013) ("[t]he CWA's permit shield provision, 33 U.S.C.S. § 1342(k), specifies that if a NPDES permit holder discharges pollutants precisely in accordance with the terms of its permit, the permit will shield its holder from CWA liability," adding that the "purpose is to relieve permit holders of having to litigate in an enforcement action the question whether their permits are sufficiently strict" and to give "permits finality"); *In re Ketchikan Pulp*

*Co.*, 7 E.A.D. 605, 1998 WL 284964 (EPA May 15, 1998) ("section 402(k) shields a discharger from liability under the CWA <u>so long as it discharges in compliance with its permit</u>" (emphasis added)).

For example, in *Coon v. Willet Dairy, LP,* 536 F.3d 171, 173 (2d Cir. 2008), the plaintiff brought a CWA citizen's suit pursuant to 33 U.S.C. § 1365. The plaintiff claimed that the permit holder violated the CWA by failing to manage its animal waste and silage leachate properly and otherwise causing environmental and public health hazards. *Id.* at 172. The permit holder moved to dismiss based on the "permit shield" defense. Based on the express terms of the permit and the permit holder's compliance therewith, the federal district court held that the permit holder "was shielded by its 'permit shield' from citizen suits for violations" and granted summary judgment against plaintiff. *Id.* at 173. And, in upholding the "permit shield," the Second Circuit explained that "compliance with an authorized permit is deemed compliant with CWA, <u>so long as Willet Dairy was acting in accordance with its permit it could not be liable in a citizen suit for CWA violations</u>." *Id.* (emphasis added).[15]

---

[15]   CWA's "permit shield" defense is akin to Minnesota Environmental Rights Act's (MERA) "no-action" clause of Minn. Stat. § 116B.03, subd. 1, which bars civil action for conduct taken by a person pursuant to any permit. *See e.g., White Bear Lake Restoration Assoc'n ex rel. State v. Minn. Dept. of Natural Resources*, 946 N.W.2d 373, 384 (Minn. 2020) (MERA's no-action "clause provides a shield for permit holders operating *in compliance with* a permit").

**B.** **The Facility's pH discharge levels demonstrably comply with its NPDES Permit**

**1.** **The then-existing only data relied on by CCE's Complaint — *i.e.*, the EPA ECHO — proves that the Facility's pH discharge levels comply with its NPDES Permit**

When considering CCE's then-existing only evidence in its Complaint (*i.e.*, the EPA ECHO), the Facility's pH discharge levels were in demonstrable full compliance with its NPDES Permit. That is, the Facility's pH discharge levels within the EPA ECHO are <u>not</u> disputed among the parties. And, as authorized by the Facility's NPDES Permit §§ 5.18.96, 5.19.162 and 5.19.164, which incorporates Minn. R. 7050.0170, the use of the Facility's pH "background levels" as the "standard" demonstrates that, as both (1) shown on the DMR values for pH (Palermo Dec., Ex. 1 at 25-26 (identifying discharge rates between 5.0 and 6.4)) relative to the "background levels" therefor (*id.* (identifying "background levels" between 3.7 and 4.24)) and (2) concluded by (a) AAPI's experts (Palermo Dec., Ex. 1 at 25-32) and (b) EPA's October 2024 Corrected EPA ECHO (Palermo Dec., Ex. 3), the Facility's pH discharge levels have been at all relevant times in full compliance with its NPDES Permit.

**2.** **AAPI's May 17, 2024 Response to Demand otherwise proves that the Facility's pH discharge levels comply with its NPDES Permit**

AAPI's May 17, 2024 Response to Demand explained to CCE, with its two expert opinions (Palermo Dec., Ex. 1 at 25-32), the Facility's pH discharge levels comply with its NPDES Permit (*id.,* Ex. 1 at 1-5). Despite this, CCE still moved forward with its Compliant without modifying its allegations of the Facility's pH violations of its NPDES Permit and argued that, "[a]s recently as June 10, 2023, the EPA records confirm that [AAPI's] Clean

Water Act Compliance was 'Violation Identified.'" ECF No. 1 at 30 (bracketed information added). Indeed CCE disregarded AAPI's explanation entirely, arguing — without either (1) explanation or (2) substantiation — that the use of Facility's "background levels" is "a legal fallacy." ECF No. 1 ¶ 39.

Courts, however, interpret NPDES permits in the same manner as a contract or other legal document. *See Nat. Res. Def. Council, Inc. v. Cnty. of Los Angeles*, 725 F.3d 1194, 1204 (9th Cir. 2013). That is, the terms of a NPDES permit "'are to be given their ordinary meaning, and when the terms . . . are clear, the intent of the parties must be ascertained from the permit itself.'" *Id.* at 1205 (quoting *Klamath Water Users Protective Ass'n v. Patterson*, 204, F.3d 1206, 1210 (9th Cir. 1999)). The Facility's NPDES Permit §§ 5.18.96, 5.19.162 and 5.19.164 have multiple references to Minn. R. ch. 7050, and its NPDES Permit § 5.19.162 specifically confirms, as follows, the incorporation of Minn. R. 7050.0170: "**Incorporation by Reference**. This permit incorporates the following applicable federal and state laws <u>applicable to the Permittee and enforceable parts of this permit</u> . . . <u>Minn. R. chs. 7050</u>." Palermo Dec., Ex. 1 at 64 (bold in original; underlining added).

### 3. EPA's October 2024 Corrected EPA ECHO removed the Facility's "Violation Identified" status

EPA's October 2024 Corrected EPA ECHO was updated to reflect the Facility's "**Compliance Status**" (or "**Facility-Level Status**") as, at all relevant times, "No Violation Identified." Palermo Dec., Ex. 3.

### III.    THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER CCE'S JUNE 12, 2024 CWA CITIZEN'S SUIT

CCE's June 12, 2024 CWA citizen's suit asserts subject matter jurisdiction under 33 U.S.C. § 1365(a) and 28 U.S.C. § 1331. ECF No. 1 ¶ 10. But, as shown above, the Facility's alleged pH violations under its NPDES Permit fail, and CCE cannot, therefore, meet its burden of proof to show that the Facility is out of compliance with its NPDES Permit and thus the CWA. Indeed, even if the Complaint included more allegations aimed at satisfying CWA's jurisdictional threshold, the pleading could not survive a factual attack because the facts prove compliance. For example, in *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc.*, 484 U.S. 49, 64 (1987), the U.S. Supreme Court held, "we agree that [33 U.S.C. § 1365] confers jurisdiction over citizen suits when the citizen-plaintiffs make a good-faith allegation of continuous or intermittent violation." (Emphasis added). It follows that CCE's allegations, which avoid the blatant evidence of compliance on EPA ECHO, are <u>not</u> "good faith allegation[s], of continuous or intermittent violation[s]," and CCE's CWA citizen's suit thus lacks subject matter jurisdiction.

This Court must <u>not</u> "blindly accept . . . unwarranted factual inferences." *Gisege,* 2007 WL 2892024, at **15-16; *Bohan,* 2002 WL 31767786, at *1 ("If a document attached to the complaint contradicts the complaint's allegations, the document controls and the court need not accept as true the inconsistent allegations in the complaint" (citing *Fayetteville Investors,* 936 F.2d at 1465; *Sazerac Co.,* F. Supp. at 257)). CCE's evidence — *i.e.*, the then-existing EPA ECHO screenshots — are, as shown by applying the pH discharge levels therein to the Facility's NPDES Permit, demonstrably in error, and they

have been, as required by the Facility's NPDES Permit §§ 5.18.96, 5.19.162 and 5.19.164, which incorporates Minn. R. 7050.0170, thus corrected to remove the "Violation Identified" status. Palermo Dec., Ex. 3. Therefore, CCE has failed to sufficiently allege its claims, and judgment on the pleadings against it is proper.

## CONCLUSION

For the foregoing reasons, AAPI's Rule 12(c) motion for judgment on the pleadings should be granted, and this matter should be dismissed with prejudice.

DATED: December 30, 2024

**TAFT STETTINIUS & HOLLISTER LLP**

By: */s/ Jack Y. Perry*
    Jack Y. Perry (MN #0209272)
    Brayanna J. Smith (MN #401770)
    Trish C. Palermo (MN #0504583)
2200 IDS Center 80 South 8th Street
Minneapolis, MN 55402-2210
Telephone: (612) 977-8400
jperry@taftlaw.com
bjsmith@taftlaw.com
tpalermo@taftlaw.com

**ATTORNEYS FOR DEFENDANT
AITKIN AGRI-PEAT, INC.**