# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Citizens for a Clean Environment, LLC, | Case No. 24-cv-02253 (ECW) |
| Plaintiff, | |
| v. | **ORDER** |
| Aitkin Agri-Peat, Inc., | |
| Defendant. | |

This matter is before the Court on Plaintiff Citizens for a Clean Environment, LLC's ("CCE") "Notice of Motion for Partial Summary Judgment" (Dkt. 20) and "Notice of Motion to Supplement the Record" (Dkt. 60); as well as Defendant Aitkin Agri-Peat, Inc.'s ("AAPI") "Fed. R. Civ. P. 12(C) [sic] Motion for Judgment on the Pleadings" (Dkt. 24), "Fed. R. Civ. P. 15(a)(2) Motion to Amend Its Answer" (Dkt. 33), "Fed. R. Civ. P. 11 Motion for Sanctions Against Citizens for a Clean Environment, LLC and its Counsel Patrick W. Michenfelder of Throndset Michenfelder Law Offices, LLC" (Dkt. 37), and "Motion to Strike Plaintiff's (1) Supplemental Declaration and (2) Related Reply Brief Argument" (Dkt. 50). The parties jointly consented to this Court's jurisdiction on September 17, 2024. (Dkt. 14; *see also* Dkt. 16 (order effectuating consent).) The Court heard argument on the Motions on February 10, 2025. (Dkt. 54 (minute entry).) The Court addresses the Motions below.

# I.    BACKGROUND

This case concerns discharges of wastewater by a peat[1] mine owned and operated by AAPI.  CCE alleges that the Aitkin Peat Mine ("the Plant"), located at 1303 Peat Plant Road in Cromwell, Minnesota (Dkt. 1 ¶ 9; Dkt. 29 at 1), sits south of East Highway 210 and is in proximity to Fond du Lac State Forest, the Sawyer State Wildlife Area, the Kettle Lake State Wildlife Management Area, and the Carl Sandell Wildlife Management Area (*see* Dkt. 1 ¶ 24; Dkt. 49 ¶ 12).  As a part of its mining operations, the Plant discharges wastewater into a system of drainage ditches, which in turn flow west until the wastewater reaches the Kettle River.  (Dkt. 26-2 at 28; *see* Dkt. 1 ¶ 23.)  This wastewater is discharged under AAPI's National Pollution Discharge Elimination System/State Disposal System ("NPDES") permit.  (Dkt. 1 ¶ 23; *see* Dkt. 26-2 at 26-70.)  In its Complaint, CCE alleges that the Plant's wastewater discharges have "unlawfully low pH levels," thereby violating the terms of its NPDES permit and consequently the Clean Water Act (Count I) and that the Plant's conduct in discharging such wastewater constitutes Minnesota common law negligence (Count II).  (Dkt. 1 ¶¶ 2, 45-61.)

## A.    The Clean Water Act and NPDES Permitting in Minnesota

The Clean Water Act ("CWA" or "Act") was implemented "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters" by

---

[1]    "Peat is the surface organic layer of a soil that consists of partially decomposed organic matter, derived mostly from plant material, which has accumulated under conditions of waterlogging, oxygen deficiency, high acidity and nutrient deficiency." *Peat*, Int'l Peatland Soc'y, https://peatlands.org/peat/#:~:text=Peat%20is%20the% 20surface%20organic,high%20acidity%20and%20nutrient%20deficiency (last visited Sept. 8, 2025).  Peat has several uses, ranging from horticulture, energy production, chemistry, and textiles.  *Id.*

creating a federal regime for regulating water pollution. 33 U.S.C. § 1251. "A central provision of the Act is its requirement that individuals, corporations, and governments secure National Pollutant Discharge Elimination System (NPDES) permits before discharging pollution from any point source into the navigable waters of the United States." *Decker v. Nw. Env't Def. Ctr.*, 568 U.S. 597, 602 (2013); *see* 33 U.S.C. § 1342 (describing permitting system for discharge of pollutants). The Act authorizes the Environmental Protection Agency ("EPA") to issue permits for the discharge of pollutants subject to the requirements of the Act and other conditions. *See* 33 U.S.C. § 1342(a)(1); *see also Env't Prot. Agency v. California ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 206 (1976) ("NPDE permits are secured, in the first instance, from the EPA, which issues permits under the authority of s 402(a)(1)."); *United States v. Sinskey*, 119 F.3d 712, 715 (8th Cir. 1997) ("The NPDES authorizes the EPA to issue permits that allow the discharge of certain pollutants within specified limitations and with specified reporting and monitoring conditions.").

Under the CWA, "it is unlawful for any person to discharge a pollutant without obtaining a [NPDES] permit and complying with its terms." *California ex rel. State Water Res. Control Bd.*, 426 U.S. at 205; *see also* 33 U.S.C. § 1311(a). "Without more, to violate an NPDES permit is to violate the Act." *United States v. STABL, Inc.*, 800 F.3d 476, 483 (8th Cir. 2015) (citation modified). Thus, the CWA "prohibits the discharge of pollutants in amounts exceeding the limitations specified in an NPDES permit." *United States v. Sinskey*, 119 F.3d 712, 715 (8th Cir. 1997). Moreover, if a permit holder acts in compliance with their NPDES permit, the holder is typically shielded from enforcement under the CWA. 33 U.S.C. § 1342(k); *see California ex rel. State Water Res. Control*

*Bd.*, 426 U.S. at 205 ("With few exceptions, for enforcement purposes a discharger in compliance with the terms and conditions of an NPDES permit is deemed to be in compliance with those sections of the [CWA] on which the permit conditions are based.").

A State can, with the approval of the EPA, take on issuing responsibilities for the waters within its own borders. *See* 33 U.S.C. § 1342(b); *California ex rel. State Water Res. Control Bd.*, 426 U.S. at 207. The State of Minnesota has sought and obtained authorization to issue NPDES permits in Minnesota, where the Minnesota Pollution Control Agency ("MPCA") performs this function. *See* Minn. Stat. § 115.03, subd. 1(a)(1), (3), (5), subd. 5 (Supp. 2025). "Accordingly, under the Minnesota Water Pollution Control Act, Minn. Stat. §§ 115.01-09 (2020), the MPCA has the authority to administer and enforce all laws relating to the pollution of any waters of the state, including the authority to issue permits requiring compliance with the CWA." *In re Reissuance of an NPDES/SDS Permit to U. S. Steel Corp.*, 954 N.W.2d 572, 576 (Minn. 2021) (citation modified).

The MPCA has designated Minnesota waters into different classes. *Id.* at 577. "As required by the Water Pollution Control Act and CWA, the MPCA adopts and applies water quality and purity standards for each class of waters." *Id.* Chapter 7050 of the Minnesota Rules sets forth the MPCA's classification and associated quality standards. *Id.* (citing Minn. R. 7050.0110 (2019)). Relevant here, Minnesota Rule 7050.0170 states:

> 7050.0170 NATURAL WATER QUALITY.
> The waters of the state may, in a natural condition, have water quality characteristics or chemical concentrations approaching or exceeding the

4

water quality standards. Natural conditions exist where there is no discernible impact from point or nonpoint source pollutants attributable to human activity or from a physical alteration of wetlands. Natural background levels are defined by water quality monitoring. Where water quality monitoring data are not available, background levels can be predicted based on data from a watershed with similar characteristics.

Where natural background levels do not exceed applicable standards, the addition of pollutants from human activity and resulting point or nonpoint source discharges shall be limited such that, in total, the natural background levels and the additions from human activity shall not exceed the standards. When reasonable justification exists to preserve the higher natural quality of a water resource, the commissioner may use the natural background levels that are lower than the applicable site-specific standards to control the addition of the same pollutants from human activity. The reasonable justification must meet the requirements under parts 7050.0250 to 7050.0335.

**Where background levels exceed applicable standards, the background levels may be used as the standards for controlling the addition of the same pollutants from point or nonpoint source discharges in place of the standards.**

In the adoption of standards for individual waters of the state, the agency will be guided by the standards herein but may make reasonable modifications of the same on the basis of evidence brought forth at a public hearing if it is shown to be desirable and in the public interest to do so in order to encourage the best use of the waters of the state or the lands bordering such waters.

Minn. R. 7050.0170 (2025) (emphasis added).

To ensure compliance with a NPDES permit, the permittee must measure water quality and submit those measurements to the MPCA in the form of Discharge Monitoring Reports ("DMRs"). *See* 40 C.F.R. § 122.41(j); Minn. Stat. § 115.04 (Supp. 2025); *see* Minn. Pollution Control Agency, *Minnesota Pollution Control Agency Wastewater Permit User's Manual* 9 (July 2022), https://www.pca.state.mn.us/sites/default/files/wq-wwtp7-09.pdf (last visited Sept. 8, 2025) ("The heart of National Pollutant Discharge Elimination System (NPDES)

permitting program is self-monitoring and reporting – and DMRs are the way you do that."); *see also* Minn. R. 7050.0150 (2025) (determining water quality and compliance with standards), 7050.0260 (2025) (setting forth how existing water quality can be determined). The MPCA generates DMR forms for a specific facility whenever a permit is issued, reissued, modified, or final limits are triggered. Minn. Pollution Control Agency, *Minnesota Pollution Control Agency Wastewater Permit User's Manual* 9 (July 2022), https://www.pca.state.mn.us/sites/default/files/wq-wwtp7-09.pdf (last visited Sept. 8, 2025).

**B.    AAPI's NPDES Permit and the Plant's Wastewater Discharges**

At issue in this action is AAPI's 2022 NPDES permit ("the Permit"), which issued on May 1, 2022 and expires on April 30, 2027. (Dkt. 26-2 at 26-70.) The Permit states that drainage flows from the active portions of the Plant into a system of field and drainage ditches, which discharge to an "unnamed ditch" that flows west until it reaches the Kettle River. (*Id.* at 28.) The Plant measures water quality using two sets of water monitors: Surface Discharge stations ("SD") and Surface Water stations ("SW"). (*Id.* at 28, 35; *see* Dkt. 26-3 at 5-6.) SW station SW005 was established as a "background monitoring station" upstream of the Plant, measuring the water quality before the Plant's drainage is added. (Dkt. 26-2 at 28, 32.) SW stations SW002 and SW003 were established downstream on the Kettle River from the Plant's discharge and measure the combined water quality. (*Id.* at 28, 30-32.) SD stations situated between the SW stations take measurements directly from field and drainage ditch outfalls. (*Id.*) The Permit sets

limits for SD stations for a variety of parameters, including a minimum pH of 6.5 and a maximum pH of 8.5.[2]  (*Id.* at 59-70.)

Relevant here, the Permit incorporates Chapter 7050 of the Minnesota Rules in two places.  First, in the Water Quality Standards section, the Permit states: "The Permittee shall operate and maintain the facility and shall control runoff, including stormwater, from the facility to prevent the exceedance of water quality standards specified in Minnesota Rules, chs. **7050** and 7060. [Minn. R. 7050, Minn. R. 7060]."  (*Id.* at 41 (emphasis added).)  Second, in the Total Facility Requirements (NPDES/SDS) section, the Permit states:

> Incorporation by Reference. This permit incorporates the following applicable federal and state laws applicable to the Permittee and enforceable parts of this permit: 40 CFR pts. 122.41, 122.42, 136, 403 and 503; Minn. R. chs. 7001, 7041, 7045, **7050**, 7052, 7053, 7060, and 7080; and Minn. Stat. chs. 115 and 166. [Minn. R. 7001].

(*Id.* at 48 (emphasis added).)

## C.    Procedural History

The Court summarizes the Motions and other relevant filings below.

### 1.    CCE's Complaint (Dkt. 1) and AAPI's Answer (Dkt. 6)

Filed on June 12, 2024, CCE's Complaint alleges that AAPI violated the Permit, and thus the CWA, by discharging water with a pH level below the allowable range set forth in the Permit.  (Dkt. 1 ¶¶ 2, 4.)  In support, CCE attaches information obtained from the EPA's Enforcement and Compliance History Online ("ECHO") website, which

---

[2]    pH measures how acidic or alkaline a substance is, measuring on a scale from 0 (highly acidic) to 14 (highly alkaline), with 7 being neutral.  *What is pH?,* Env't Prot. Agency (Nov. 4, 2024), https://www.epa.gov/goldkingmine/what-ph; *see also* Dkt. 1 ¶ 3.

reflects readings taken from the Plant's Monitoring System and submitted by AAPI to the MPCA. (*See* Dkt. 1-1 at 7-11, 12-20; Dkt. 1-2 at 1-10, 11-15.) This information includes a "Detailed Facility Report" accessed on March 27, 2024, which displays the Plant's compliance status as "Violation Identified" and states that the Plant was in noncompliance for six of the previous 12 quarters. (Dkt. 1-1 at 7-8.)

CCE also attached a "DMR Exceedances Report" that was also accessed on March 27, 2024. (*Id.* at 12-20.) That report provided a list of the Plant's exceedances,[3] summarized in the following table:

| Date | Parameter | DMR Value | Limit Value |
|------|-----------|-----------|-------------|
| 6/30/2022 | pH | 6.20 | >=6.5 |
| 6/30/2022 | pH | 6.30 | >=6.5 |
| 8/31/2022 | pH | 6.40 | >=6.5 |
| 11/30/2022 | pH | 6.20 | >=6.5 |
| 11/30/2022 | pH | 5.70 | >=6.5 |
| 4/30/23 | pH | 5 | >=6.5 |
| 4/30/23 | pH | 5.60 | >=6.5 |
| 5/31/2023 | pH | 6.10 | >=6.5 |
| 5/31/2023 | pH | 6.40 | >=6.5 |
| 1/31/2024 | pH | 6.20 | >=6.5 |
| 1/31/2024 | pH | 6.30 | >=6.5 |

---

[3] This Order uses "exceedance" to mean any reported pH level outside of the 6.5 to 8.5 range set by the Permit.

| Date | Parameter | DMR Value | Limit Value |
|------|-----------|-----------|-------------|
| 2/29/2024 | pH | 6.40 | >=6.5 |

(*Id.* at 17-18.)  Also attached to the Complaint are documents showing an updated "Detailed Facility Report" and "DMR Exceedances Report" as of June 10, 2024, which show the same data.  (Dkt. 1-2.)

In total, CCE alleges that AAPI violated the Permit 363 days between June 30, 2022 and February 29, 2024.  (Dkt. 1 ¶¶ 4, 28, 59.)  The Complaint further alleges that there "is no evidence that Defendant has modified its pH related waste-water treatment equipment, or implemented any modifications to its pH related waste-water treatment plant policies, procedures or practices between June 30, 2022" and the filing of the Complaint.  (*Id.* ¶¶ 6-43.)

The Complaint also alleges that CCE gave AAPI, the EPA, and the MPCA 60 days notice prior to the filing of its lawsuit as required by 33 U.S.C. § 1365(b)(1)(A).  (*Id.* ¶¶ 27-28; Dkt. 1-1 at 2-5 (pre-suit notice letter).)  Then, according to the Complaint, AAPI solicited a settlement offer from CCE, thereby "inducing" CCE into believing AAPI was interested in settling and causing it to delay the filing of this action.  (*Id.* ¶¶ 31, 35.)  But "[u]nbeknownst" to CCE, AAPI had also contacted the MPCA and "two experts," before responding to CCE with a 140-page letter expressing a lack of interest in settlement and included "improper ad hominem attacks," news articles about CCE's counsel, and other documents.  (*Id.* ¶¶ 32-36.)  The letter informed CCE that the EPA data relied on its notice letter was "demonstrably incorrect" because it failed to take into account background water quality levels pursuant to Minnesota Rule 7050.0170.  (*Id.*

9

¶ 37.)  CCE alleges that this series of actions "suggests that Defendant facilitated and requested that the MPCA support its position."  (*Id.* ¶ 38.)

As to CCE's standing, CCE alleges in a single paragraph:

> Plaintiff's membership includes at least one individual who has visited and enjoyed the natural beauty and quietude of the area in immediate proximity to Defendant's Aitkin Peat Mine. Defendants [sic] repeated unlawful dumping of pollution herein described lessens the aesthetic and recreational values of the area and diminishes this person's enjoyment of the area.

(*Id.* ¶ 44.)  The Complaint does not identify any "individual" member by name.

As relief, the Complaint seeks a declaration that AAPI violated the CWA; an order requiring AAPI to hire an independent party to determine the "root cause" of the alleged violations; an order requiring AAPI to prepare and submit a plan to the EPA addressing the present and future alleged violations; an order requiring AAPI hire an independent party to review its best management practices plan and consult and seek approval of that plan from the EPA; and injunctive relief to stop the alleged ongoing violations and prevent future violations.  (*Id.* at 13-14.)  CCE also asks the Court to levy a civil penalty against AAPI for each day it was in violation of the CWA; award CCE fees and costs; and award CCE nominal, compensatory, and punitive damages.  (*Id.* at 14.)

AAPI filed its Answer on July 5, 2024.  (Dkt. 6.)  In it, AAPI asserts several affirmative defenses, including that "CCE's claims for civil penalties are barred because the Complaint fails to assert a violation of AAPI's NPDES permit and thus the CWA." (*Id.* ¶ 65.)

## 2.    CCE's Summary Judgment Motion (Dkt. 20)

On November 26, 2024, CCE filed "Plaintiff's Notice of Motion for Partial Summary Judgment" ("Summary Judgment Motion").  (Dkt. 20.)  In its supporting

memorandum, CCE seeks summary judgment on several issues:  that the Court has subject matter jurisdiction over this action; that CCE has Article III standing; that AAPI violated the Permit's pH limits, as proven by its DMRs; that AAPI's discussions with the MPCA did not modify the Permit to allow for those discharges; that the MPCA had no authority to issue a "modified" permit with pH limits below those allowed federally and that any such modified pH limits are preempted; and that, regardless, a permit modification would not absolve AAPI of its past violations.  (Dkt. 25 at 22-45.)  CCE filed two declarations in support of its Summary Judgment Motion: a Declaration of Partick W. Michenfelder (Dkt. 26) and a Declaration of Mark Arendt ("Arendt Declaration") (Dkt. 27).  The Arendt Declaration states:

> 2. I am the founding member of Citizens for a Clean Environment, LLC (CCE).
>
> 3. CCE was formed for the purpose of holding polluters accountable if they don't follow the law.
>
> 4. I have visited and enjoyed the natural beauty of the area in the immediate proximity to Defendant's Aitkin Peat Mine (the Area) and will continue to do so.
>
> 5. Defendants [sic] repeated unlawful pollution at issue in this case my enjoyment [sic] of the Area.

(Dkt. 27 at 1.)

AAPI filed its opposition to the Summary Judgment Motion on January 17, 2025. (Dkt. 44.)  AAPI disputes that CCE has Article III standing (*id.* at 38-45) and argues that no CWA violations occurred because the Permit incorporates Minnesota Rule 7050.0170, which takes into account background water quality levels (*id.* at 46-48).  AAPI also filed a Declaration of Brayanna J. Smith (Dkt. 45), attached to which are copies of its DMRs

showing the measurement data cited by CCE in its Complaint (*see* Dkts. 45-1, 45-2, 45-3, 45-4, 45-5, 45-6, 45-7).

CCE filed a reply in support of its Summary Judgment Motion (Dkt. 48) on January 31, 2025, and also filed a Supplemental Declaration from Mark Arendt ("Supplemental Arendt Declaration") (Dkt. 49) stating:

1. I am a life-long Minnesota resident.

2. I have a cabin.

3. I own a boat and enjoy boating.

4. I care about Minnesota, its people and its environment.

5. I was a recent candidate for election to the Montgomery City Council in Minnesota, garnering more than 20% of the vote.

6. I have been a small-business owner since 1997.

7. I travel for both business and personal reasons, and have done so for years.

8. I have traveled Interstate 35 from Minneapolis to Duluth countless times and will continue to do so.

9. I was married in Duluth.

10. I have stopped at the Black Bear Casino Resort many times over the years, which is located just off Interstate 35 where it intersects highway 210, about 20 miles or so South of Duluth, and will continue to do so.

11. In connection with visits to the Black Bear Casino Resort, I have regularly enjoyed taking the approximately 20-mile scenic drive West on highway 210 to Cromwell and back, and I will continue to do so at least every year or two. Driving this route, and driving through Minnesota scenery like it, is enjoyable and calming to me.

12. The Defendant's peat mining operation is located on that route, about 12 miles West of Interstate 35, and is within a hundred yards or less South of highway 210. *Id.* The Fondulac [sic] State Forest is located to the North of Defendant's peat mining operation, and the Kettle Lake Wildlife Management area to the South.

13. The Defendant's discharge of excessively acidic wastewater at issue in this case -- which the EPA indicates can be associated with damage to the skin and gills of fish, reproductive failure, and decreased growth, disease or death -- lessens my enjoyment of this scenic and peaceful drive and its value to me.

14. CCE000049 and CCE000050, attached as Exhibits A and B to hereto, are Google Maps images depicting the proximity of Defendant's peat mining operation to Hwy 210.

(Dkt. 49 at 1-2.)

### 3.    AAPI's Rule 12(c)/Rule 56 Motion (Dkt. 24)

On December 23, 2024, AAPI filed a "Notice of Hearing on its Fed. R. Civ. P. 12(C) [sic] Motion for Judgment on the Pleadings." (Dkt. 22.) Seven days later, on December 30, 2024, AAPI filed "Defendant's Fed. R. Civ. P. 12(C) [sic] Motion for Judgment on the Pleadings" and supporting papers. (Dkt. 24; *see* Dkts. 29-32.) AAPI seeks judgment on the pleadings, arguing that the Court lacks subject matter jurisdiction because CCE has not made a good faith allegation of continuous or intermittent violations. (Dkt. 29 at 30.) AAPI argues that CCE's allegation is not in good faith because the "permit shield" defense provided in 33 U.S.C. § 1342(k) applies because AAPI is in compliance with the Permit. (Dkt. 29 at 26-29.) AAPI sought summary judgment as an alternative to judgment on the pleadings, so the Court refers to this motion as the "Rule 12(c)/Rule 56 Motion." (Dkt. 24 at 1 n.1; Dkt. 29 at 1 n.1.)

CCE filed its opposition to the Rule 12(c)/Rule 56 Motion on January 21, 2025. (Dkt. 46.) AAPI filed its reply in support of its Rule 12(c)/Rule 56 Motion on January 31, 2025. (Dkt. 47.) Citing to the parties' briefs in connection with CCE's Summary Judgment Motion, AAPI identified CCE's lack of Article III standing as a basis for dismissal in its reply. (*See id.* at 8, 10.)

13

### 4.    AAPI's Motion to Amend Its Answer (Dkt. 33) and Motion for Sanctions (Dkt. 37)

Also on December 30, 2024, AAPI filed "Defendant's Fed. R. Civ. P 15(a)(2) Motion to Amend Its Answer" ("Motion to Amend") (Dkt. 33) and "Defendant's Fed. R. Civ. P. 11 Motion for Sanctions Against Citizens for a Clean Environment, LLC and its Counsel Patrick W. Michenfelder of Throndset Michenfelder Law Offices, LLC" ("Motion for Sanctions") (Dkt. 37). AAPI's Motion to Amend seeks to amend its Answer to "expressly include" its 33 U.S.C. § 1342(k) "permit shield" affirmative defense, despite the fact that AAPI believes it "more than sufficiently pled" such a defense. (Dkt. 33 at 1.) In its Motion for Sanctions, AAPI seeks dismissal of this action with prejudice and recovery of reasonable fees, costs, and expenses due to CCE's "lack of any factual or legal bases for its claims against AAPI due to the applicability of 33 U.S.C. § 1342(k)'s Clean Water Act 'permit shied' [sic] defense because of [the Plant's] full compliance with its [NPDES] Permit." (Dkt. 37 at 1.) That same day, AAPI also filed memoranda (Dkts. 34, 38) and a Declaration of Brayanna J. Smith (Dkt. 39) in support of the Motion to Amend and Motion for Sanctions. AAPI argues that, before CCE filed this lawsuit, AAPI gave CCE documentation that showed the Plant's discharges did not violate the Permit. (Dkt. 38 at 1-2.) Specifically, AAPI states that in May 2024, before CCE filed this action, it gave CCE's counsel the opinions of two experts retained by AAPI concluding that the Plant had not violated the Permit (Dkt. 38 at 3; *see* Dkt. 39-2 at 84-85, 86-91); in September 2024, it gave CCE's counsel emails from the MPCA informing AAPI that the emissions identified had been marked by the agency as "except[ed] per MN Rule 7050.1070" and that the violation status on ECHO

would be updated (Dkt. 38 at 4-5; *see* Dkt. 39-3 at 2-5); and in October 2024, it gave CCE's counsel updated ECHO screenshots showing "No Violation Identified" for the periods identified in the Complaint (Dkt. 38 at 6-7; *see* Dkt. 39-4 at 2-16).  AAPI argues that these documents put CCE on notice that its CWA claim was baseless.  (Dkt. 38 at 1-3.)

On January 6, 2025, CCE filed an opposition to the Motion to Amend and Motion for Sanctions.  (Dkt. 43.)  As to the "permit shield" defense, CCE contends that the plain language of the Permit sets a lower pH limit of 6.5 for the Plant's discharges and that AAPI's documentation only confirms that it did discharge water having a pH below that limit.  (*Id.* at 12-13.)  Further, CCE asserts that AAPI's communications with MPCA after CCE served its 60-day notice letter constitute an attempted modification of the Permit that violates the public notice requirement, conflicts with federal technology based effluent limits, and violates the CWA's "anti-backsliding" provision (under the theory that the Permit set a lower limit for pH of 6.5 and the MPCA's acceptance of measurements below 6.5 constitutes "backsliding").  (*Id.* at 7-11 (citing 33 U.S.C. § 1342(o)).)  According to CCE, this means the Motion for Sanctions "is premised on an utter fiction driven by Defendant's fundamental misapprehension of the legal principles that govern its conduct."  (*Id.* at 12.)  According to CCE, the Court should use its inherent powers to sanction AAPI because "Defendant's counsels' communications have been permeated with uninformed, unprofessional, improper and irrelevant ad hominem attacks and insults" and "rather than raising legitimate, civilly-argued defenses, Defendants [sic] continue to resort to the type of name-calling that courts, including this District, have repeatedly found to be improper and even sanctionable in cases."  (*Id.* at 12-18.)

### 5. AAPI's Motion to Strike (Dkt. 50)

On February 7, 2025, AAPI filed "Defendant's Motion to Strike Plaintiff's (1) Supplemental Declaration and (2) Related Reply Brief Argument" ("Motion to Strike") (Dkt. 50; *see* Dkts. 51-53).  The Motion to Strike asks the Court to strike the Supplemental Arendt Declaration (Dkt. 49) and CCE's arguments based on that document in its reply in support of its Summary Judgment Motion (Dkt. 48).  (Dkt. 50 at 1.)  CCE did not file an opposition to the Motion to Strike, but responded to the arguments during the February 10, 2025 hearing.

### 6. Additional Procedural History and CCE's Motion to Supplement the Record (Dkt. 60)

On February 10, 2025, the Court heard argument on the Summary Judgment Motion (Dkt. 20), Rule 12(c)/Rule 56 Motion (Dkt. 24), Motion to Amend (Dkt. 33), Motion for Sanctions (Dkt. 37), and Motion to Strike (Dkt. 50).  (Dkt. 54 (minute entry).) The Court took the Motions under advisement at the conclusion of the hearing.  (*Id.* at 1.) The Court directed AAPI to file a letter by February 18, 2025 stating whether it wished to depose Arendt or have him testify at an evidentiary hearing as to standing.  (*Id.*)  On February 17, 2025, AAPI filed a letter stating that it did not wish to depose Arendt.  (Dkt. 55.)

The next day, on February 18, 2025, CCE filed a letter with the Court seeking permission to supplement the record with documents produced by AAPI to CCE after the February 10, 2025 hearing, including a NPDES permit for a separate facility operated by AAPI and "two related emails."  (Dkt. 56 at 1.)  CCE wrote: "I have communicated with opposing counsel regarding this matter, and it is my understanding that they are agreeable

to supplementing the record in accordance with Plaintiff's request in whatever manner the Court would prefer." (*Id.*) CCE also included additional merits arguments based on the exhibits it sought to introduce. (*Id.* at 1-5.) Based on CCE's representation as to opposing counsel's agreement, on February 19, 2025, the Court ordered CCE to instead file an unopposed motion to supplement the record. (Dkt. 57.)

Later that day, AAPI filed a letter with the Court in which it contested the language used in CCE's letter and the request it sought, arguing CCE "(1) failed to attach the parties' email exchange leading up to AAPI's begrudging conditional agreement to CCE's submission of the additional evidence as insisted on by AAPI, (2) improperly submitted unrequested and unagreed to additional argument therewith and (3) submitted additional argument which was demonstrably wrong." (Dkt. 58 at 1.) The Court subsequently issued an Order on the Parties' letters as follows:

> The Court has reviewed the letter filed [by AAPI] in response to the letter filed [by CCE]. Both letters are STRICKEN from the record and the Courts Order at Docket 57 is VACATED. The Court will not consider any arguments or exhibits attached to those letters in connection with any of the motions under advisement. If a party seeks relief from the Court, it must file an appropriate motion that complies with the Federal and Local Rules.

(Dkt. 59.)

CCE thus filed a Motion to Supplement the Record on February 21, 2025. (Dkt. 60.) It filed its supporting memorandum (Dkt. 62) and a Declaration of Patrick W. Michenfelder including the emails and permit previously sought to be introduced (Dkt. 63) on March 6, 2025, as well as a Notice of Hearing on the Motion to Supplement the Record for March 20, 2025 (Dkt. 61). AAPI filed its opposition on March 13, 2025. (Dkt. 66.) On March 14, 2025, the Court informed the Parties that it would decide the

Motion on the papers and cancelled the March 20, 2025 hearing, taking the Motion to

Supplement the Record under advisement as of that date.  (Dkt. 67.)

## II.    SUMMARY JUDGMENT AND RELATED MOTIONS

As explained in Section II.B, the Court dismisses this action because Plaintiff

lacks Article III standing.  However, before turning to the merits of that issue, the Court

addresses the nondispositive motions filed by the parties to the extent they affect the

scope of the relevant record.  Among other things, the parties disagree as to the basic

question of what the Court should consider when deciding CCE's Summary Judgment

Motion and AAPI's Rule 12(c)/Rule 56 Motion.  The Court begins with that issue as it

relates to Article III standing.

### A.    Scope of the Record

Article III standing is a "threshold question in every federal court case."  *United

States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003).  As Plaintiff,

CCE "bears the burden of establishing standing as of the time [it] brought this lawsuit

and maintaining it thereafter."  *Carney v. Adams*, 592 U.S. 53, 59 (2020).  Relevant to the

parties' dispute over the record, the Supreme Court has held that a plaintiff's burden to

establish standing changes as a case proceeds through its stages.  *See Lujan v. Defenders

of Wildlife*, 504 U.S. 555, 561 (1992) (stating that the plaintiff must prove Article III

standing "with the manner and degree of evidence required at the successive stages of the

litigation").  The Supreme Court has described these stages and their corresponding

burdens of proof as follows:

> At the pleading stage, general factual allegations of injury resulting from the
> defendant's conduct may suffice, for on a motion to dismiss we presume that
> general allegations embrace those specific facts that are necessary to support

the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Id.* (citation modified).

In this case, CCE sought summary judgment on the issue of Article III standing (Dkt. 20) while AAPI originally made Article III standing arguments in the context of its motion for judgment on the pleadings under Rule 12(c) (Dkt. 24). But AAPI "alternatively move[d] herein for summary judgment pursuant to Fed. R. Civ. P. 56" in its Rule 12(c)/Rule 56 Motion.[4] (Dkt. 24 at 1 n.1; Dkt. 29 at 1 n.1.) Moreover, "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Here, AAPI filed a Declaration of Trish C. Palermo ("Palermo Declaration") (Dkt. 30) and attached the following exhibits to the Palermo Declaration: a copy of correspondence between AAPI and CCE with the Plant's 2022 NPDES permit within (Dkt. 30-1); a copy of AAPI's 2013 NPDES permit (Dkt. 30-2); reports from the EPA's ECHO database on October 1, 2024 (Dkt. 30-3); a copy of the EPA ECHO's Known Data Problems webpage (Dkt. 30-4); and a copy of a letter from AAPI to CCE's counsel Patrick Michenfelder (Dkt. 30-5). It is true that a court may

---

[4]    CCE argues that this request means AAPI has not properly moved for summary judgment. (Dkt. 46 at 4.) But this ignores the plain language of Rule 12(d) as well as the well-established principle that district courts can convert, consider, and grant summary judgment sua sponte. *See* 5 Wright & Miller's Federal Practice and Procedure § 1366 (3d ed. 1998) ("The court, sua sponte, may convert a motion under Rule 12(b)(6) into one for summary judgment . . . ."); *cf. Madewell v. Downs*, 68 F.3d 1030, 1048-49 (8th Cir. 1995) (listing cases where the district court raised summary judgment sua sponte).

consider materials outside pleadings if they "are part of the public record[,] do not contradict the complaint," or "are necessarily embraced by the pleadings." *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (citation modified).  But some, if not all, of the exhibits attached to the Palermo Declaration do not fall into those categories; the Court therefore treats AAPI's motion as a motion for summary judgment and considers those exhibits along with the evidence submitted by CCE.  *See Groska v. N. States Power Co. Pension Plan*, No. 05-cv-114 (JNE/FLN), 2005 WL 3447619, at *2 n.1 (D. Minn. Dec. 15, 2005) ("A court must convert a motion for judgment on the pleadings to a motion for summary judgment when matters outside the pleadings are presented to and not excluded by the court, *see* Fed.R.Civ.P. 12(c), unless the materials submitted are matters of public record, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings.").

### 1.    AAPI's Motion to Strike (Dkt. 50)

The Court next turns to AAPI's Motion to Strike the Supplemental Arendt Declaration and CCE's arguments based on the statements contained in that Declaration. AAPI argues that the Supplemental Arendt Declaration violates District of Minnesota Local Rule 7.1(c) because it raises new facts not included with CCE's opening arguments that are not responsive to any facts raised by AAPI in its opposition to CCE's Summary Judgment Motion.  (Dkt. 51 at 2-4.)  AAPI also contends that CCE lacks standing even if

the Court considers the Arendt Supplemental Declaration and related arguments.  (*Id.* at 4-6.)[5]

While the Court is sympathetic to AAPI's Rule 7.1 argument (because there does not appear to be any reason why the statements in the Supplemental Arendt Declaration could not have been included in the Arendt Declaration), the Court denies the Motion to Strike because the Supplemental Arendt Declaration relates to Article III standing.  In the context of a motion to dismiss, the Supreme Court stated:

> For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. **At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing.** If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.

*Warth v. Seldin*, 422 U.S. 490, 501-02 (1975) (emphasis added) (citation omitted).

Applying this principle, courts have permitted plaintiffs to submit evidence in support of their standing with their reply arguments.  *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 111 (D.C. Cir. 2021) ("The court at times may allow plaintiffs to support their standing in their reply brief, in affidavits submitted along with the reply brief, through citations to the existing record at oral argument, or through additional

---

[5]    AAPI made an alternative request in its brief for leave to take the deposition of Arendt and file an additional response to CCE's Reply.  (Dkt. 51 at 7.)  However, at the end of the February 10, 2025 hearing, the Court ordered AAPI to clarify whether it still sought to depose Arendt (Dkt. 54 (minute entry)), and AAPI responded that it did not (Dkt. 55).  The Court denies the Motion to Strike insofar as it seeks supplemental briefing because AAPI made its arguments during the hearing and supplemental briefing is not necessary for the Court to decide the issue of Article III standing.

briefing or affidavits submitted to the court after oral argument." (citation modified));

*N.M. Cattle Growers Ass'n v. U.S. Fish & Wildlife Serv.*, 81 F. Supp. 2d 1141, 1149

(D.N.M. 1999) ("The Court will consider all submitted portions of Plaintiffs' reply brief

on the standing issue, including the tendered exhibits. . . . [T]his Court will not generally

consider issues raised for the first time in a reply brief, *except when those issues relate to*

*jurisdictional requirements*."), *rev'd on other grounds*, 248 F.3d 1277 (10th Cir. 2001);

*cf. Murphy v. Aurora Loan Servs., LLC*, 699 F.3d 1027, 1031 (8th Cir. 2012) ("While we

generally will not consider arguments raised for the first time in a reply brief, because

this challenge relates to our jurisdiction, we will consider the merits of the claim."

(citation omitted)).  The Court does the same here and will consider the Arendt

Supplemental Declaration in connection with the parties' Article III standing arguments.

Accordingly, AAPI's Motion to Strike (Dkt. 50) is denied.

   2.    **AAPI's Motion to Amend (Dkt. 33) and CCE's Motion to Supplement
         the Record (Dkt. 60)**

   AAPI seeks leave to amend its Answer "to expressly include as an affirmative

defense 33 U.S.C. § 1342(k)'s Clean Water Act (CWA) 'permit shield' defense."  (Dkt.

34 at 1.)  For its part, CCE moves to supplement the summary judgment record to include

additional emails between AAPI and the MPCA as well as a copy of a NPDES permit

issued to AAPI in 2012 for a different facility operated by AAPI.  (Dkts. 63-1, 63-2.)

Neither the amendment nor the supplementation is relevant to the question of Article III

standing, which is the basis for the Court's dismissal of this action.  The Court therefore

denies both motions as moot.  *See Jackson v. Dayton*, No. 17-CV-0880 (WMW/TNL),

2018 WL 3696600, at *2 (D. Minn. Aug. 3, 2018) (denying plaintiff's motion to amend

as moot in view of dismissal of the amended complaint); *Gamut Control LLC v. Rydberg*, No. 09-CV-913 (JNE/SRN), 2009 WL 3164433, at *2 (D. Minn. Sept. 25, 2009) (recommending denial of defendant's other motions "[i]n light of this Court's recommendation for dismissal of this lawsuit").

## B.    Article III Standing

As discussed above, whether CCE has Article III standing has been fully briefed in the summary judgment context.  For the reasons stated below, the Court finds that CCE does not have such standing and dismisses this lawsuit.

### 1.    Legal Standard

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a). The initial burden of showing that no genuine issue of material fact exists lies with the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual dispute is "material" only if resolving it might affect a suit's outcome under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").  When deciding a summary judgment motion, a court should draw all justifiable inferences in the nonmovant's favor.  *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).  When deciding cross-motions for summary judgment, a court views the record in the light most favorable to

the defendant when considering the plaintiff's motion, and in the light most favorable to the plaintiff when evaluating the defendant's motion. *Durand v. Fairview Health Servs.*, 230 F. Supp. 3d 959, 965 (D. Minn. 2017).

### 2.    Discussion

The Court turns to whether CCE has Article III standing to bring this action. Article III of the Constitution limits federal courts to deciding only "cases" and "controversies," U.S. Const. art. III, § 2, a fundamental limit to the "category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To satisfy Article III's standing requirements, a plaintiff must first show (1) "it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61). Second, the plaintiff must show (2) "the injury is fairly traceable to the challenged action of the defendant;" and third, that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* These requirements "insist[] on strict compliance." *Raines v. Byrd*, 521 U.S. 811, 819 (1997); *see Spokeo*, 578 U.S. at 338 ("Our cases have established that the 'irreducible constitutional minimum' of standing consists of three elements.") (quoting *Lujan*, 504 U.S. at 560). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth*, 528 U.S. at 185. A federal court lacks subject matter jurisdiction over a case when the plaintiff lacks Article III standing. *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 92-94 (1998)).

CCE alleges a theory of associational standing to bring this case on behalf of its members. (Dkt. 25 at 26.) "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Here, AAPI's arguments focus on whether CCE has established the first prong of the *Hunt* test. (*See* Dkt. 44 at 39-45 & n.7.) The Court concludes that CCE does not have associational standing to bring this action because it does not meet the first prong of the *Hunt* test, and does not address the other two prongs.

To satisfy the first prong of the *Hunt* test, only one of an association's members need Article III standing to sue. *See Warth*, 422 U.S. at 511; *City of Kennett, Mo. v. Env't Prot. Agency*, 887 F.3d 424, 431 (8th Cir. 2018). In this case, CCE has identified Mark Arendt as its member with standing.[6]

CCE relies on the Complaint, the Arendt Declaration, and the Supplemental Arendt Declaration to show it has Article III standing. First, the Complaint states:

> Plaintiff's membership includes at least one individual who has visited and enjoyed the natural beauty and quietude of the area in immediate proximity to Defendant's Aitkin Peat Mine. Defendants [sic] repeated unlawful

---

[6]    In its Complaint, CCE failed to identify a single member that had Article III standing to bring this case. (*See* Dkt. 1 ¶ 44.) This may well be an independent reason to dismiss this case. *See Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 601-02 (8th Cir. 2022) (requiring plaintiffs to "make specific allegations establishing that at least one identified member had suffered or would suffer harm" to establish Article III standing (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009)). However, since the parties have made standing arguments based on matters outside the pleadings and in the summary judgment context, the Court addresses Article III standing based on the evidentiary record.

dumping of pollution herein described lessens the aesthetic and recreational values of the area and diminishes this person's enjoyment of the area.

(Dkt. 1 ¶ 44.)

Next, in support of its Summary Judgment Motion, CCE relies on the Arendt

Declaration, which states:

2. I am the founding member of Citizens for a Clean Environment, LLC (CCE).

3. CCE was formed for the purpose of holding polluters accountable if they don't follow the law.

4. I have visited and enjoyed the natural beauty of the area in the immediate proximity to Defendant's Aitkin Peat Mine (the Area) and will continue to do so.

5. Defendants [sic] repeated unlawful pollution at issue in this case my enjoyment [sic] of the Area.

(Dkt. 27 at 1.)

And finally, CCE filed the Supplemental Arendt Declaration with its reply,

which states in relevant part:

3. I own a boat and enjoy boating.

4. I care about Minnesota, its people and its environment.

. . .

10. I have stopped at the Black Bear Casino Resort many times over the years, which is located just off Interstate 35 where it intersects highway 210, about 20 miles or so South of Duluth, and will continue to do so.

11. In connection with visits to the Black Bear Casino Resort, I have regularly enjoyed taking the approximately 20-mile scenic drive West on highway 210 to Cromwell and back, and I will continue to do so at least every year or two. Driving this route, and driving through Minnesota scenery like it, is enjoyable and calming to me.

12. The Defendant's peat mining operation is located on that route, about 12 miles West of Interstate 35, and is within a hundred yards or less South of

highway 210. *Id.* The Fondulac [sic] State Forest is located to the North of Defendant's peat mining operation, and the Kettle Lake Wildlife Management area to the South.

13. The Defendant's discharge of excessively acidic wastewater at issue in this case -- which the EPA indicates can be associated with damage to the skin and gills of fish, reproductive failure, and decreased growth, disease or death -- lessens my enjoyment of this scenic and peaceful drive and its value to me.

(Dkt. 49 at 1-2.) The Supplemental Arendt Declaration also includes two images from Google Maps showing the Plant and surrounding area. (Dkts. 49-1, 49-2.)

AAPI contends that CCE has failed to articulate a cognizable injury in fact or that its alleged injury is traceable to the challenged conduct of the Plant. (Dkt. 44 at 39-45; *see* Dkt. 51 at 4-6.) The Court begins with injury in fact.

To establish an injury in fact, standing's "first and foremost" element, *Steel*, 523 U.S. at 103, the harm alleged by the plaintiff must be both particularized and concrete, *Lujan*, 504 U.S. at 560. For an injury to be particularized to a plaintiff, it "must affect the plaintiff in a personal and individual way." *Lujan*, 504 U.S. at 560 n.1. Concreteness, on the other hand, requires the injury to be "real, and not abstract." *Spokeo*, 578 U.S. at 340 (citation modified); *see id.* ("A 'concrete' injury must be '*de facto*'; that is, it must actually exist."). But a harm need not necessarily be tangible to be concrete. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("Various intangible harms can also be concrete.").

"[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan*, 504 U.S. at 562-63. Indeed, the Supreme Court has "held that environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for

whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth*, 528 U.S. at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). That said, "[t]he relevant showing for Article III standing is not injury to the environment but injury to the plaintiff." *Id.* at 169. As the Supreme Court has explained:

> Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process. But the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured.

*Sierra Club*, 405 U.S. at 734-35.

In *Lujan v. National Wildlife Federation* ("*National Wildlife*"), the Supreme Court considered whether affidavits submitted by certain environmental organizations in the summary judgment context established those organizations' standing to challenge an action of the U.S. Bureau of Land Management under the Administrative Procedure Act ("APA").[7]   497 U.S. 871, 875-85 (1990). The relevant portion of the APA, 5 U.S.C.

---

[7]   Although *National Wildlife* involved standing under the APA, the Supreme Court has discussed *National Wildlife* when deciding standing in the Article III context. *See, e.g.*, *Friends of the Earth*, 528 U.S. at 183 ("Our decision in [*National Wildlife*], is not to the contrary. In that case an environmental organization assailed the Bureau of Land Management's 'land withdrawal review program,' a program covering millions of acres, alleging that the program illegally opened up public lands to mining activities. The defendants moved for summary judgment, challenging the plaintiff organization's standing to initiate the action under the Administrative Procedure Act, 5 U.S.C. § 702. We held that the plaintiff could not survive the summary judgment motion merely by offering 'averments which state only that one of [the organization's] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action.'" (citing *National Wildlife*, 497 U.S. at 889)).

§ 702, provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." *Id.* at 882 (quoting 5 U.S.C. § 702). At the district court level, the court considered two affidavits when determining whether the plaintiff organizations had established a genuine issue of material fact to show § 702 standing. *Id.* at 885. One affidavit from a member of a plaintiff organization stated:

> My recreational use and aesthetic enjoyment of federal lands, particularly those in the vicinity of South Pass-Green Mountain, Wyoming have been and continue to be adversely affected in fact by the unlawful actions of the Bureau and the Department. In particular, the South Pass-Green Mountain area of Wyoming has been opened to the staking of mining claims and oil and gas leasing, an action which threatens the aesthetic beauty and wildlife habitat potential of these lands.

*Id.* at 886. The second affidavit from a member of a plaintiff organization "was substantially the same [], with respect to all except the area involved." *Id.*

While recognizing that "[a]t the margins there is some room for debate as to how 'specific' must be the 'specific facts' that Rule 56(e) requires in a particular case," *id.* at 889, the Supreme Court found:

> [W]here the fact in question is . . . whether one of [the plaintiff organizations'] members has been, or is threatened to be, 'adversely affected or aggrieved' by Government action—Rule 56(e) is assuredly not satisfied by averments which state only that one of [the plaintiff organizations'] members uses unspecified portions of an immense tract of territory, on some portions of which mining activity has occurred or probably will occur by virtue of the governmental action.

*Id.* at 889. These "general allegation[s] of injury" could not "be deemed to constitute averment of requisite specific facts" sufficient to overcome summary judgment. *Id.*

Two years later, in *Lujan*, the Supreme Court addressed Article III standing in the summary judgment context. 504 U.S. at 562-63. In *Lujan*, the Supreme Court found that

affidavits submitted by members of the plaintiff organizations who had traveled to overseas locations that were the traditional habitats of certain endangered species and hoped to do so again were insufficient to defeat summary judgment for lack of standing. *Id.* at 563-64. Not only did the affidavits "plainly contain no facts . . . showing how damage to the species will produce 'imminent' injury to [the members]," the affiants' professed intent to return to those locations, "without any description of concrete plans, or indeed even any specification of when the some day will be" did not support a finding of the actual or imminent injury required by Supreme Court precedent. *Id.* at 564.

In contrast, several years after *Lujan*, in *Friends of the Earth*, the Supreme Court found that the plaintiff-environmental organizations had standing to bring a CWA challenge against the defendant-facility for its violations of its NPDES permit by discharging pollutants into the North Tyger River. 528 U.S. at 175-76, 188-89. In that case, the evidence found sufficient to establish standing was as follows:

> [Friend of the Earth] member Kenneth Lee Curtis averred in affidavits that he lived a half-mile from Laidlaw's facility; that he occasionally drove over the North Tyger River, and that it looked and smelled polluted; and that he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by Laidlaw's discharges. Curtis reaffirmed these statements in extensive deposition testimony. For example, he testified that he would like to fish in the river at a specific spot he used as a boy, but that he would not do so now because of his concerns about Laidlaw's discharges.
>
> Other members presented evidence to similar effect. [M]ember Angela Patterson attested that she lived two miles from the facility; that before Laidlaw operated the facility, she picnicked, walked, birdwatched, and waded in and along the North Tyger River because of the natural beauty of the area; that she no longer engaged in these activities in or near the river because she was concerned about harmful effects from discharged pollutants; and that she and her husband would like to purchase a home near the river but did not intend to do so, in part because of Laidlaw's discharges.

> [M]ember Judy Pruitt averred that she lived one-quarter mile from Laidlaw's facility and would like to fish, hike, and picnic along the North Tyger River, but has refrained from those activities because of the discharges. [M]ember Linda Moore attested that she lived 20 miles from Roebuck, and would use the North Tyger River south of Roebuck and the land surrounding it for recreational purposes were she not concerned that the water contained harmful pollutants. In her deposition, Moore testified at length that she would hike, picnic, camp, swim, boat, and drive near or in the river were it not for her concerns about illegal discharges. [M]ember Gail Lee attested that her home, which is near Laidlaw's facility, had a lower value than similar homes located farther from the facility, and that she believed the pollutant discharges accounted for some of the discrepancy. [M]ember Norman Sharp averred that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe in the North Tyger River closer to Laidlaw's discharge point, but did not do so because he was concerned that the water contained harmful pollutants.

*Id.* at 181-183 (citations omitted). The Supreme Court contrasted these affidavits with "the mere 'general averments' and 'conclusory allegations' found inadequate in [*National Wildlife*]," further distinguishing the *Friends of the Earth* affiants' "conditional statements—that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it" from "the speculative '"some day" intentions' to visit endangered species halfway around the world" found "insufficient to show injury in fact" in *Defenders of Wildlife*. *Id.* at 183-84. In *Friends of the Earth*, the affidavits established that "Laidlaw's pollutant discharges, and the affiants' reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests." *Id.*

It is clear from this authority that CCE has not set forth facts establishing injury in fact. Arendt's statements can be summarized as follows: he has driven and will continue to drive "at least every year or two" on Highway 210 to Cromwell when visiting a casino; he enjoys the drive due to its scenic beauty and finds the drive calming; the Plant "is

located on that route," about 100 yards south of Highway 210, north of the Kettle Lake Wildlife Management Area, and south of Fond du Lac State Forest; and AAPI's "discharge of excessively acidic wastewater at issue in this case -- which the EPA indicates can be associated with damage to the skin and gills of fish, reproductive failure, and decreased growth, disease or death -- lessens [Arendt's] enjoyment of this scenic and peaceful drive and its value to [him]."  (Dkt. 27 ¶¶ 4-5; Dkt. 49 ¶¶ 10-13.)

Arendt also states that he owns a boat and enjoys boating.  (Dkt. 49 ¶ 3.)  But, in contrast to the *Friends of the Earth* affiants, he does not state that he has ever boated on the Kettle River or in the area near the Plant.  He does not state that he would boat on the Kettle River or in the area near the Plant were it not for the discharges at issue.  He similarly does not state that he has ever fished, swum in, or walked by the Kettle River in the relevant area, nor that he would do any of those things were it not for the discharges at issue.  He does not state that he can see or smell the Kettle River, much less see or smell any effect of the discharges on the Kettle River, when driving on Highway 210—or that he has done so under any circumstances.  Indeed, Arendt, unlike the *Friends of the Earth* affiants, does not identify a single thing he would do differently if the Plant altered its discharges; rather, it appears that he "will continue to" take the same route on his way to the casino notwithstanding his concerns about pollution and its impact on fish.  (Dkt. 49 ¶ 10.)  Moreover, while Arendt states "the EPA indicates [the discharge of excessively acidic wastewater] **can be** associated with damage to the skin and gills of fish, reproductive failure, and decreased growth, disease or death" (Dkt. 49 ¶ 13 (emphasis added)), he has not stated (nor has CCE offered any evidence) that any fish in the Kettle

River are so affected or that any other aspect of the Kettle River is affected by the discharge—much less affected in a way that Arendt could discern.

While not binding on this Court, other district courts that have considered similar evidence have reached the same conclusion as to standing. In *HEAL Utah v. PacifiCorp*, the affiant member alleged an injury in fact due to her inability to "view and enjoy natural streams flowing into Huntington Creek when she drives on the highway that runs by the Plant," because she "like[d] to look for birds and wildlife in areas with streams and vegetation" and "PacifiCorp's conversion of the area from a natural stream to an unnatural piping system with no visible stream harms [her] aesthetic and environmental interests of enjoying and viewing the wild and natural characteristics of flowing streams along Highway 31." 375 F. Supp. 3d 1231, 1245-46 (D. Utah 2019). The court found this insufficient because:

> Critically, [the plaintiff organization's member] offers no statement describing whether or how the aesthetic view changed as a result of the installation of the collection system. At bottom, her testimony merely describes things she enjoys viewing, and states that she does not see those things from Highway 31. Her conclusory statement that PacifiCorp's conduct reduced her enjoyment of the area, without testimony demonstrating she personally experienced any aesthetic change from Highway 31, cannot establish a concrete injury in fact.

*Id.* at 1246.

Similarly, in *Arkansas Nature Alliance, Inc. v. United States Army Corps of Engineers*, the court, citing *Friends of the Earth*, dismissed the action at the summary judgment stage for lack of standing, stating:

> [T]he only connection any plaintiff had with the [disputed] area was viewing its beauty as they drove by along the interstate. . . . The Court acknowledges that the plaintiffs appear to be deeply concerned about the environment and wetlands in particular. However, they simply have not established the

> necessary personal and particularized injury in fact to them by the Project in the [disputed] area that is different from the general public. Therefore, the Court finds that all plaintiffs lack standing to bring this lawsuit.

No. 4:05CV00622 GH, 2006 WL 8444732, at *7 (E.D. Ark. May 9, 2006). The Court finds the reasoning in *HEAL Utah* and *Arkansas Nature Alliance* persuasive and reaches the same conclusion here.

In sum, Arendt, as a person who "care[s] about Minnesota, its people and its environment," may have a "special interest" in the Kettle River's water quality and experienced lessened enjoyment of his drive through that area, but he has not shown that he is "directly affected" by the discharges. *See Lujan*, 504 U.S. at 563 (citation modified). Based on his own statements, Arendt's lessened enjoyment is based on his knowledge of the Plant's discharge of "excessively acidic wastewater," which he believes is unlawful, and his knowledge that the EPA has indicated such discharge "can be associated with damage" to fish. (*See* Dkt. 49 ¶ 13.) If this were sufficient to confer Article III standing, any environmentally minded person driving through an area near a river containing fish that might be affected by unlawful discharges could file a citizen suit under the CWA in federal court. That is not the law. The Court dismisses this action without prejudice for lack of subject matter jurisdiction because CCE fails to offer evidence in connection with summary judgment to show an injury in fact to its member Mark Arendt, and consequently fails to establish Article III standing.

For these reasons, CCE's Summary Judgment Motion is denied insofar as it seeks summary judgment that the Court has subject matter jurisdiction and AAPI's Rule 12(c)/Rule 56 Motion is granted insofar as it seeks summary judgment that the Court lacks subject matter jurisdiction. The Complaint is dismissed without prejudice for lack

of Article III standing.[8]  *See Christian Lab. Ass'n v. City of Duluth*, 142 F.4th 1107, 1111

(8th Cir. 2025) ("If either Article III or prudential standing is absent, the appropriate

remedy is to dismiss the case without prejudice." (citation modified)).  The remainders of

CCE's Summary Judgment Motion and AAPI's Rule 12(c)/Rule 56 Motion are denied as

moot.  *See Hunter v. Securly, Inc.*, No. 24-cv-2159 (DWF/DLM), 2024 WL 4979660, at

*4 (D. Minn. Dec. 4, 2024) ("The Court grants Securly's motion to dismiss under Rule

12(b)(1).  To meet Article III's standing requirements, a plaintiff must establish injury in

fact.  Hunter fails to do so, meaning that the Court does not have subject matter

jurisdiction over Hunter's claims.  Securly's motion to dismiss under Rule 12(b)(6) and

motion to strike under Rule 12(f) are therefore rendered moot.").

## III.    AAPI'S MOTION FOR SANCTIONS

Finally, the Court considers AAPI's Motion for Sanctions (Dkt. 37).  AAPI seeks

Rule 11 sanctions against CCE and CCE's counsel for filing and pursuing this action.

(Dkts. 37, 38.)  AAPI contends that, in light of providing CCE evidence of its 33 U.S.C.

§ 1342(k) "permit shield" defense, including (1) two expert opinions supporting that

defense in May 2024, before CCE filed this case on June 12, 2024, (2) an email from the

---

[8]    CCE also alleged negligence under Minnesota law (Dkt. 1 ¶¶ 57-61), presumably
pursuant to supplemental jurisdiction as the Complaint does not allege the parties are
diverse (*see id.* ¶¶ 8-10).  The parties treated the CWA and negligence claims the same
for standing purposes, and the Court has done the same here.  *See Hillesheim v. Holiday
Stationstores, Inc.*, 900 F.3d 1007, 1010 (8th Cir. 2018) ("To pursue state-law claims in
federal court, a party must prove that it has standing under Article III's case-or-
controversy requirement.").  In any event, having found no standing for the CWA claim,
the Court would decline to exercise supplemental jurisdiction and would dismiss the state
law negligence claim.  *See Ferguson v. Wabasha Cnty.*, No. 18-CV-1541 ADM/ECW,
2019 WL 3842585, at *1 (D. Minn. Aug. 15, 2019) (declining to exercise supplemental
jurisdiction over and dismissing state claims after granting the defendant's motion for
summary judgment and dismissing federal law claim).

MPCA indicating its reports would be updated to indicate no violation on September 9, 2024, and (3) updated EPA ECHO reports showing no violation on October 8, 2024, CCE knew or learned of the "baselessness" of its claims, yet still pursued this action. (Dkt. 38 at 1-7.)  AAPI requests the immediate dismissal of the Complaint with prejudice and reasonable attorneys' fees, costs, and expenses incurred in defending this case and bringing its Motion for Sanctions.  (Dkt. 37 at 1; Dkt. 38 at 21-22.)

CCE and its counsel respond that it is instead AAPI who "misapprehen[ds]" the legal issues and proposes that the Court use its inherent authority to sanction AAPI and/or its counsel for "uninformed, unprofessional, [and] improper" communications and "irrelevant ad hominem attacks and insults." (Dkt. 43 at 12-18.)  Specifically, CCE takes exception to AAPI's highlighting of an ethics complaint previously brought against one of CCE's lawyers.  (*Id.* at 16-18.)  CCE asks the Court to sanction AAPI pursuant to its inherent authority.  (*Id.*)

As explained below, the Court denies the Motion for Sanctions and CCE's request.

## A.    Legal Standard

AAPI seeks sanctions under Rule 11.[9]  (*See* Dkt. 37.)  Rule 11 states in relevant part:

> (b) Representations to the Court. By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

---

[9]    AAPI references the Court's inherent authority in its brief (Dkt. 38 at 15) but did not move for sanctions pursuant to that authority (*see* Dkt. 37).  In any event, the Court would decline to impose sanctions pursuant to its inherent authority for the same reasons it denies AAPI's request for sanctions under Rule 11.

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11.  Before moving for Rule 11 sanctions, the accusing party must serve the allegations on the violating party and give them 21 days to withdraw or correct the filing in dispute ("safe harbor period").  *Id.* at 11(c)(2).  Only if the violating party refuses to withdraw or correct the disputed filing can the accusing party then file a motion for sanctions.  *Id.*

"[T]he imposition of a Rule 11 sanction is not a judgment on the merits of an action.  Rather, it requires the determination of a collateral issue: whether the attorney has abused the judicial process, and, if so, what sanction would be appropriate."  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990).  "In determining whether a violation of Rule 11 has occurred, the district court must apply an 'objective reasonableness' standard."  *N.A.A.C.P.-Special Contribution Fund v. Atkins*, 908 F.2d 336, 339 (8th Cir. 1990) (quoting *O'Connell v. Champion Int'l Corp.*, 812 F.2d 393, 395 (8th Cir. 1987)); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991) ("Rule 11, for example, imposes an objective standard of reasonable inquiry which does not mandate a finding of bad faith.").  Such a determination is fact specific.  *See Cooter*, 496 U.S. at 403 (a Rule 11

determination "depends greatly on factual determinations"). As it relates to frivolity, the district court must determine "whether a reasonable and competent attorney would believe in the merit of an argument." *Coonts v. Potts*, 316 F.3d 745, 753 (8th Cir. 2003) (quoting *Miller v. Bittner*, 985 F.2d 935, 939 (8th Cir. 1993)). As for providing an evidentiary basis, Rule 11 sanctions may be levied if a claim "did not have any basis in fact, if the party failed to present any facts supporting the claim, or if the claim was based on immaterial factual allegations." *Franklin v. Pinnacle Ent., Inc.*, 289 F.R.D. 278, 285 (E.D. Mo. 2012) (citing *MHC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 625 (8th Cir. 2003)). "Rule 11 embraces the idea that on occasion attorneys engage in litigation tactics that are unjustifiable within the broad bounds of our adversarial system, and that our system does not tolerate such tactics," but its application "also recognizes the adversarial nature of a system where attorneys zealously represent their clients." *MHC Inv. Co. v. Racom Corp.*, 323 F.3d 620, 626-27 (8th Cir. 2003).

**B.     Discussion**

As background, AAPI provided CCE with its rationale for why the Plant had not violated the Permit or the CWA with two supporting expert opinions in May 2024, and threatened Rule 11 sanctions at that time (Dkt. 30-1 at 1-5); CCE filed its Complaint on June 12, 2024 (Dkt. 1); AAPI served notice of its intent to seek Rule 11 sanctions on CCE on October 24, 2024 (Dkt. 39 ¶ 6; Dkt. 39-6, Ex. 10); AAPI served its Rule 11 brief on November 12, 2024 (Dkt. 39 ¶ 14; Dkt. 39-14, Ex. 18), and AAPI filed its Rule 11 motion on December 30, 2024 (Dkt. 37). AAPI seeks sanctions based on CCE's filing of the Complaint and because CCE "refused to drop its Complaint" in response to the MPCA's September 9, 2024 email stating it had updated its database and marked the pH

data as an exception per Rule 7050.1070 and the EPA ECHO reports showing no violation provided to CCE in October 2024.  (Dkt. 38 at 16-17.)

The Court begins with the filing of the Complaint.  The advisory committee notes to the 1993 amendments to Rule 11 state: "Ordinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely."  Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.  Here, if AAPI's arguments and two expert opinions provided to CCE in May 2024 so clearly established the baselessness of CCE's claims, it is unclear why AAPI waited until October 2024 to serve notice of its intent to seek Rule 11 sanctions on CCE—particularly when AAPI had threatened Rule 11 sanctions in its May 2024 letter.  *See Landon v. Hunt*, 938 F.2d 450, 453 (3d Cir. 1991) ("[W]e are at a loss to understand why the Hunts did not file their motion until almost six months *after* November 13, 1989.  Since they knew, on that date, of the conduct which gave rise to the sanction motion, their inordinate delay in filing the motion is contrary to our intention to heed the drafters of Rule 11 who suggest early action by litigants who believe they have a valid ground for requesting sanctions under the Rule.") (citation modified); *MGA Ent., Inc. v. Nat'l Prods. Ltd.*, No. CV 10-07083 JAK (SSx), 2012 WL 4052023, at *5 (C.D. Cal. Sept. 14, 2012) (denying motion for sanctions as untimely because movant waited over six months after the purported improper behavior to file the motion); *see also TRI, Inc. v. Boise Cascade Off. Prods., Inc.*, No. CIV.00-1464 RHK/AJB, 2002 WL 31108190, at *2 (D. Minn. Sept. 20, 2002) (relying on delay as one reason to deny a motion for Rule 11 sanctions).  The delay in seeking Rule 11 sanctions based on the filing of the Complaint is one reason why the Court denies the Motion for Sanctions.

More importantly, the crux of CCE's claims and AAPI's defenses is whether and to what extent the Permit incorporates Minnesota Rule 7050.0170 and thus shields AAPI from the CWA claim. Interpretation of a permit is a question of law for a court. *See Danks v. Fields*, 696 F.2d 572, 575-76 (8th Cir. 1982) (interpreting grazing permit is "a question of law to be decided by the courts"); *see, e.g.*, *Nw. Envt'l. Advocs. v. City of Portland*, 56 F.3d 979, 982 (9th Cir. 1995) (reviewing the district court's interpretation of a " [NPDES] permit as [it] would the interpretation of a contract or other legal document"). AAPI's arguments and experts' opinions that the Permit's pH limits incorporate Minnesota Rule 7050.0170 and AAPI is entitled to a "permit shield" defense may turn out to be a winning argument on a different day, but AAPI did not cite any clear legal authority on that point. Having reviewed the parties' voluminous filings in detail, the Court concludes that CCE's theories and responses to AAPI's "permit shield" defense arguments are not so without merit that the Court can find their assertion constitutes abuse of the judicial process. *See Cooter*, 496 U.S. at 396. For all of these reasons, the Court declines to impose sanctions under Rule 11 and denies AAPI's Motion for Sanctions.

As for CCE, it asked the Court to sanction AAPI pursuant to its inherent authority in CCE's opposition to the Motion for Sanctions. (*See* Dkt. 43 at 13-18.) This request is denied because CCE did not file a motion in support of its request. *See* Fed. R. Civ. P. 7(b)(1) ("A request for a court order must be made by motion.").

## IV.    ORDER

Based on the above, and on the files, records, and proceedings herein, **IT IS ORDERED** that:

1.    Plaintiff Citizens for a Clean Environment, LLC's Notice of Motion for Partial Summary Judgment (Dkt. 20) is **DENIED** insofar as it seeks summary judgment that the Court has subject matter jurisdiction and otherwise **DENIED** as moot;

2.    Defendant Aitkin Agri-Peat, Inc.'s Fed. R. Civ. P. 12(c) Motion for Judgment on the Pleadings (Dkt. 24) is **GRANTED** insofar as it seeks summary judgment that the Court lacks subject matter jurisdiction and otherwise **DENIED** as moot;

3.    Defendant Aitkin Agri-Peat, Inc.'s Fed. R. Civ. P. 15(a)(2) Motion to Amend Its Answer (Dkt. 33) is **DENIED** as moot;

4.    Defendant Aitkin Agri-Peat, Inc.'s Fed. R. Civ. P. 11 Motion for Sanctions Against Citizens for a Clean Environment, LLC and its Counsel Patrick W. Michenfelder of Throndset Michenfelder Law Offices, LLC (Dkt. 37) is **DENIED**;

5.    Plaintiff Citizens for a Clean Environment, LLC's request that the Court use its inherent authority to sanction Defendant Aitkin Agri-Peat, Inc. and/or its counsel (Dkt. 43) is **DENIED**;

6.    Defendant Aitkin Agri-Peat, Inc.'s Motion to Strike Plaintiff's (1) Supplemental Declaration and (2) Related Reply Brief Argument (Dkt. 50) is **DENIED**;

7.    Plaintiff Citizens for a Clean Environment, LLC's Notice of Motion to Supplement the Record (Dkt. 60) is **DENIED** as moot; and

8.    The Complaint (Dkt. 1) is **DISMISSED WITHOUT PREJUDICE**.


**LET JUDGMENT BE ENTERED ACCORDINLY.**



Dated: September 8, 2025                    <u>*s/Elizabeth Cowan Wright*</u>
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge